[Civ. No. 14125. Third Dist. Apr. 12, 1974.]

AMERICAN MUTUAL LIABILITY INSURANCE COMPANY, Petitioner, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
JOHN G. NORK et al., Real Parties in Interest.

## COUNSEL

McDonough, Holland, Schwartz & Allen, Milton L. Schwartz and Richard E. Brandt for Petitioner.

No appearance for Respondent.

Rust, Armenis & Matheny, David C. Rust, Freidberg, Mart & Mahon, Edward Freidberg and James D. Mart for Real Parties in Interest.

## OPINION

**RICHARDSON, P. J.**—Petitioner, American Mutual Liability Insurance Company, hereinafter "American," at all relevant times was malpractice insurance carrier for Sacramento County Medical Society, hereinafter "Society," one of whose members was John G. Nork, M.D. Nork, and Mercy General Hospital of Sacramento, hereinafter "Mercy," were sued for malpractice by Albert Gonzales. Nork, Mercy, and Gonzales comprise the real parties in interest. The proceedings giving rise to the issues before us occurred during the trial of that action.

Petitioner American, seeks herein alternatively a writ of prohibition, or mandamus, or certiorari directed to respondent court and to the real parties in interest. The first two extraordinary writs are sought to prevent respondent court from taking further action relative to the disclosure of the contents of files worked up by attorney Gray, engaged by American to represent Nork in the defense of previous malpractice actions against him. Additionally, a writ of certiorari is sought directing respondent court to transmit a record of the proceedings of the trial court concerning the production of the files.

The documents in question form nine separate files developed and maintained by Gray. Though the exact nature and content of the files have

never been fully and clearly stated, Gray testified that they included, as to each file, his correspondence with Nork and others, research references, interrogatories, and investigative and expert reports. Responsive to our request, American, which also has not seen the subject files, describes them more fully, so far as known to it, as consisting of several kinds of documents including written reports from attorneys discussing the status of the actions, comments by counsel on depositions and trial testimony, discussion of the possibilities of Nork's exposure to an adverse judgment and the probable range thereof, settlement negotiations, discussions with defense witnesses and consultants and other comments and opinions, all comprising so-called "status reports" sent by Nork's attorneys to American, the insurer, but not to Nork, the insured; a second class of information includes investigative reports furnished by investigators for American including interviews with Nork and others, which reports were forwarded to the attorneys with a copy to American; a third type of report is that of consultants, largely physicians, contacted by the attorney concerning medical issues; a fourth class of communication consists of letters from American commenting on and discussing the first three classes of documents; finally, there are reports of the Medical Review and Advisory Committee of the Society concerning a medical evaluation and review of Nork's surgeries. Apparently the contents of the files are arranged chronologically and are segregated neither by source nor particular subject matter.

We will review the contentions of the parties, trace the history of the litigation, consider the element of mootness, examine the nature of the extraordinary writs sought to be invoked, discuss the relationships of the parties and the various privileges asserted, including the lawyer-client privilege described in Evidence Code section 952, the work product rule defined in Code of Civil Procedure section 2016, subdivision (b), the statutory proscriptions against disclosure of proceedings and records of medical review committees of the Society expressed in Evidence Code section 1157, and the nature and scope of the waivers thereof. We will conclude by issuing a peremptory writ of mandate directing the trial court to vacate and set aside its order of disclosure of the files in question.

The respective contentions of the parties may be summarized. American claims that the files and records, containing as they do confidential communications and evaluations given and received by the attorney in question, are either conditionally or absolutely privileged under both the lawyer-client and work product privileges, and that as to portions of the files, the immunity from disclosure arises from Evidence Code section 1157. Gonzales and Mercy, in concert, take the position that the trial court

found as a fact that American was not a client of Gray. Alternatively, they argue that if it was such a client, the lawyer-client privilege has been expressly or impliedly waived, and additionally has been rendered inapplicable because, it is charged, the services of counsel were sought or obtained "to commit . . . a crime or fraud," and thus the privileges were dissipated by Evidence Code section 956. Gonzales also asserts loss of the lawyer-client privilege because of the breach of duty by the attorney. (Evid. Code, § 958.)

The foregoing contentions frame the essential issues which may be generally stated: Does American have a privilege in some form to prevent the disclosure of the contents of the files and, if so, has the interrelationship or subsequent conduct of the parties destroyed the privilege?

A review of the history of the litigation in question underscores the complexity and unusual character of the procedural context from which the issues arise.

Nork, an orthopedic surgeon with a substantial medical practice in the Sacramento area, was named defendant in a series of malpractice actions. American, in the discharge of its duties as malpractice carrier for Nork and for the purpose of defending him, engaged the services of two firms of attorneys; one, Hassard, Bonnington, Rogers and Huber of San Francisco, and the other, Wilke, Fleury, Sapunor and Hoffelt of Sacramento of which Gray was and is a member.

The attorneys, together with the investigators and claims personnel of American, prepared for the trials of the various malpractice cases and extensive discovery was effected. Trial of the first two cases, namely, Hendrick and de la Torre, resulted in substantial malpractice verdicts against Nork for both compensatory and punitive damages. Thereafter, and while other actions were pending against him, Nork, through attorney Harper, filed with respondent court an action for declaratory relief hereinafter described as the "Nork action," against his carrier American, and his judgment creditor Hendrick, in which Nork asserted that American declined to pay the punitive damage portion of the Hendrick and de la Torre judgments. He further alleged that American refused to accept Hendrick's or de la Torre's pretrial offers to settle their claims against him within American's policy limits notwithstanding Nork's demands that they do so, charging American thereby with acting in bad faith. Other causes of action in the Nork case sounded in misrepresentation and negligent and willful breach of the fiduciary obligation owing by American to Nork in its refusal to review and properly evaluate Nork's records and to

consider his impaired health as a factor affecting his defense. A final cause of action asserted that American pressured Nork into adopting certain "positions" in the discovery proceedings and in his testimony in the trial of the Hendrick's action, which "positions" were untrue and known by American and its counsel to be untrue, and provably so, thus subjecting Nork to impeachment; further, that American's defense of the punitive damage claim in the Hendrick's trial was, by design, passive only, the purpose and effect of which was to reduce the compensatory award which American agreed that it was obligated to pay, and to inflate the punitive damage claim, responsibility for which American disclaimed.

American's defense of the Nork action against it proceeded concurrently with the trial of the action against Nork and codefendant Mercy by a third malpractice claimant, Gonzales. Upon the filing of the Nork action against American, Gray's firm withdrew as counsel of record in all cases then pending against Nork. In February and March, 1973, proceedings were instituted in the Nork action by American's codefendant Hendrick seeking injunctive relief to prevent destruction of American's investigative records in order to preserve the bad faith claims asserted by Hendrick and Nork against American. A series of discovery moves was made in the Nork action by Hendrick and Nork directed at American and its representatives seeking to establish the validity of Nork's causes of action against American as above described. These proceedings triggered responsive moves by American for protective orders as to noticed depositions and for orders to quash subpoenas duces tecum. Temporary stays of some of these discovery moves in the Nork action were issued by the Presiding Judge of the Sacramento County Superior Court. Extensive depositions of attorneys, investigators and claims personnel, however, were taken and partially completed. The Nork action remains pending in respondent superior court.

Thereafter, in the course of the Gonzales trial, Gray was served by Gonzales' attorney, who also represented judgment creditors Hendrick, de la Torre, and other malpractice claimants against Nork, with a subpoena duces tecum directing him to appear as a witness and to produce "The files—documents, papers, records—memorandums and other writings contained in said files" used by Gray in the defense of Nork in nine specific Sacramento County malpractice cases, including Hendrick and de la Torre, which as we have noted had theretofore been reduced to judgment. Additionally, the subpoena directed Gray to produce all "documents of any type" relating to Gray's opinions as to Nork's competency and health, all communications from Nork to Gray or any of his associates pertaining to the described cases, all communications and records to or

from Gray's firm concerning the relationship of codefendant Mercy and Nork, all communications between Gray's firm and the counsel for Mercy, counsel for Gonzales, co-counsel for Nork, claims personnel for American, and all communications, written or oral "by any physician or surgeon which contains any impression or opinion regarding the care and treatment rendered by JOHN G. NORK to any or all of the patients described in the paragraphs above or which contain, in any way or manner, any impression or opinion regarding JOHN G. NORK's surgical judgment, competency or abilities."

The stated purpose of this broad and sweeping disclosure as described in the affidavit of Gonzales' attorney supporting the subpoenas was thus expressed: "Said documents will demonstrate information that was imparted and the threats, intimidation and other corrupt practices that were allegedly practiced upon defendant JOHN G. NORK and will either impeach his testimony or give support to his testimony. Defendant NORK's credibility is the single most critical issue in this lawsuit and all of these documents should contain material that will either impeach or substantiate his testimony."

The records were produced by Gray in court during the Gonzales trial and marked for identification, but were not inspected by the court or counsel. At the time of their production, although it was not a party to the Gonzales action, American appeared specially and argued against disclosure, pointing to the pendency in another department of respondent court of its request for a protective order in Nork's action against American, and further asserting that disclosure of the described records violated the work product rule, described in Code of Civil Procedure section 2016, subdivision (b) and the lawyer-client privilege defined in Evidence Code section 952.

The trial court heard testimony from Gray, and arguments, and subsequently declared that it would permit the discovery of the entire contents of four of the nine files in question. The court noted Nork's testimony in the Gonzales trial to the effect that he relied on statements made to him by his counsel of record retained by American. The court found such testimony germane to the issue of Nork's liability to Gonzales for punitive damages since Nork's purported reliance on his attorney's counsel thereby would excuse or explain Nork's conduct which was the basis of Gonzales' punitive damage claim, and that to deny Gonzales access to the records would effectively limit his right to rebut Nork's contentions and thus be unfair to Gonzales. Additionally, the trial court indicated that the lawyer-client privilege as to Nork had been waived by Nork's own testimony.

Further, the court determined that American was not a client of Gray, and, alternatively, if it was, that the communications between counsel and client involved the subornation of perjury and thus constituted criminal conduct, thereby excepting the communications from the privilege pursuant to Evidence Code section 956. As to the work product contention, the trial court construed the work product privilege contained in Code of Civil Procedure section 2016, subdivision (b) as similar to the immunities enfolding medical society committees' deliberations and records as defined in Evidence Code section 1157, and thus found that the information neither being absolutely privileged, nor inadmissible in evidence if disclosed, but only non-discoverable, the privilege may be and was "waived by the partial disclosure." As to the portions of the records pertaining to the committee of the Society the court found that they had been disclosed to Gray, and, presumably with American's approval, by Gray to Nork. When Nork then disclosed by his testimony in the Gonzales action portions of the committee's proceedings as related to him by Gray, the trial court concluded: "It seems to me that the insurance company has allowed these disclosures; Nork has made them; and that the work product privilege that would otherwise be absolute has been dissipated. . . . Now I think you can tell from my remarks that personally I see no reason at this time why you shouldn't have full access to all of the Nork files . . ."

The court then announced its intention to reject American's objections and to permit immediate disclosure in their entirety of Gray's files in the four enumerated cases. At that time, American's counsel was not present, but on the same day filed with us its petition. We granted a temporary stay and thereafter issued an alternative writ of prohibition.

American, asserting the pendency of numerous other malpractice actions against Nork, represents to us that it will suffer irreparable damage in its defenses of the other actions by disclosure of the communications in question given in confidence and containing as they do opinions and evaluations between American and its attorneys, consultants and investigators.

## I. *Mootness*

■ Preliminarily, we dispose of a threshold matter. The subpoenaed records were sought in the then pending Gonzales v. Nork case. At the time of oral argument we were advised that the Gonzales case was then being argued to the trial court. All evidence in Gonzales having previously been introduced, and some time having since elapsed during which presumably the issues were submitted, we can assume that any judgment entered in Gonzales is now approaching finality in the trial court. While

it might be asserted that the issues involving discoverability of the files in question thereby have become moot, none of the parties so contends. Rather, it is agreed that other actions of a similar nature are pending involving Nork, American, and numerous other malpractice claimants in which the resolution of the issues herein presented will be both helpful and controlling. Accordingly, for the future guidance of the trial court and counsel, we review the issues and first consider the nature of the relief sought.

## II. *The Remedy*

In Gonzales v. Nork, the court was engaged in the conduct of a long trial, during the course of which access was sought to the questioned files. No challenge has been raised as to the authority of the court to make a ruling on the disputed material. As noted, American has sought, alternatively, a writ of mandamus, prohibition or certiorari. These extraordinary remedies are, by statute, pointed at specific areas of judicial inquiry. By Code of Civil Procedure section 1085, mandamus may issue to compel the performance by an inferior court of an act which the law requires such inferior court to perform. The writ of prohibition is the counterpart of mandate. Its function, as expressed in Code of Civil Procedure section 1102, is to arrest and prevent proceedings of an inferior court or a judge of such court which has exceeded its jurisdiction. The writ of certiorari, also denominated writ of review, will lie in cases where the inferior court has exceeded its jurisdiction and there is neither appeal nor plain, speedy, nor adequate remedy in accordance with sections 1068 and 1074. All three writs have a common and fundamental basis: the action taken by the lower court must be in excess of its jurisdiction, or there must be a failure or refusal by the lower court to perform an act within its jurisdiction. Several Supreme Court and appellate court expressions have amplified these limitations on appellate use of the prerogative writs during the trial process. (*Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 287 [109 P.2d 942, 132 A.L.R. 715]; *Bird* v. *Justice Court* (1960) 182 Cal.App.2d 674, 677 [6 Cal.Rptr. 502] (prohibition); *O'Bryan* v. *Superior Court* (1941) 18 Cal.2d 490, 496 [116 P.2d 49, 136 A.L.R. 595] (mandamus); *Fleming* v. *Superior Court* (1925) 196 Cal. 344, 352-353 [238 P. 88] (certiorari); 5 Witkin, Cal. Procedure (2d ed. 1971) Extraordinary Writs, §§ 27, 33, pp. 3802-3803 and 3806.)

■ On the other hand, other and more recent expressions of the Supreme Court have made it clear that the appellate court may review *discovery* orders when challenged by the assertion of privileges, by the use of the prerogative writs of prohibition. The high court, however, has

emphasized the need for restraint by stating "But this does not mean that these discretionary writs will or should issue as of course in all cases where this court may be of the opinion that the interim order of the trial court was erroneous. In most such cases, as is true of most other interim orders, the parties must be relegated to a review of the order on appeal from the final judgment. As inadequate as such review may be in some cases, the *prerogative writs should only be used in discovery matters to review questions of first impression* that are of *general importance* to the trial courts and to the profession, and *where general guidelines can be laid down* for future cases." (Italics added.) (*Oceanside Union School Dist.* v. *Superior Court* (1962) 58 Cal.2d 180, 185, fn. 4 [23 Cal.Rptr. 375, 373 P.2d 439].) These admonitions were further amplified by the Supreme Court in *Pacific Tel. & Tel. Co.* v. *Superior Court* (1970) 2 Cal.3d 161, 169-171 [84 Cal. Rptr. 718, 465 P.2d 854], which cautioned against "too lax a view of the 'extraordinary' nature of prerogative writs," as causing undue pretrial delay in the discovery phases of a trial. Nonetheless where properly invoked prerogative writs will lie to protect the privileges in question. (*Holm* v. *Superior Court* (1954) 42 Cal.2d 500, 505 [267 P.2d 1025]; *Union Oil* v. *Superior Court* (1957) 151 Cal.App.2d 286, 290 [311 P.2d 640].) The applicable rule has been stated thusly: "Although prohibition is in theory a jurisdictional writ [citation] the alternative use of mandamus [citation] has had the effect of changing the test from excess of jurisdiction to abuse of discretion. Hence the discovery order may be prohibited not only where it is wholly invalid, but also where, under the circumstances, it constitutes an abuse of the lower court's discretion. [Citation.]" (Witkin, Cal. Evidence (2d ed. 1966) p. 959.)

Although observing the foregoing principles to have particular application in the area of pretrial discovery, we view the disclosure of the files in the matter before us, although occurring *at trial* as discovery in a larger sense. (See generally, Louisell/Wally, Modern Cal. Discovery (2d ed.) pp. 442-553.) We further recognize the force and rationale of *Oceanside* to cases where, as here, the confrontation between disclosure and privilege occurs during trial itself. Ordinarily, appellate reluctance to intervene, stemming in part from the trial court delay thereby occasioned, would cause the parties to be left to their appellate remedy. Nonetheless in the matter before us unusual circumstances combine—no pretrial discovery is involved, the trial has proceeded without delay to judgment and the disclosure of the files unless interdicted may irreparably affect other pending actions between the parties in the manner which we will hereinafter develop. Here both the procedural situation and the remedies solicited are extraordinary. Such a case in our view raises questions of first impres-

sion which are of general importance and which, if properly addressed, may furnish guidelines for the disposition of future cases invoking that exception permitting injunctive relief expressed in *Oceanside*. No valid purpose will be served through the piece meal disposition in installments of the issues common to the group of Nork cases pending and prospective.

We examine the merits of the respective contentions relative to the trial court's order.

### III. *The Relationship of the Parties—Joint Clients*

American engaged two firms of attorneys to represent Nork. Our attention focuses for the moment on Mr. Gray. The obligations of Gray as the attorney for the insured Nork when retained by the insurer American, have been analyzed and defined in *Lysick* v. *Walcom* (1968) 258 Cal.App.2d 136 [65 Cal.Rptr. 406, 28 A.L.R.3d 368] (hg. den.). *Lysick* underscores the dual obligation resting upon the attorney in such a situation. ██ ██ We extract from *Lysick* several relevant principles: An attorney may represent dual interests provided there is both consent and full disclosure to the clients; where an attorney represents two clients with divergent interests, the attorney must disclose all facts necessary to permit the client to make informed decisions regarding the subject concerning which the attorney represents the client; although the attorney must act fairly and in good faith, the attorney's actions must fall within the general standards of professional care enunciated in Business and Professions Code section 6068 and Rules of Professional Conduct successively recited in 52 Cal.2d pages 893-899, and 1 Cal.3d rules 51-58; the obligation owing to an insured by an attorney selected by an insurance carrier is the same obligation of good faith as that owed by an attorney personally retained by the client, and is affected by the scope of his employment, that is, he may be generally employed for all purposes related to the claim or he may be engaged only for the court representation.

Gonzales and Mercy insist, and the trial court so held, that the existence of the lawyer-client relationship is a factual question. It is argued that the trial court having resolved as an issue of fact that Gray represented Nork not American, we are thereby foreclosed from further inquiry. We consider such a contention of doubtful validity and at best only qualifiedly true. Save where appointed by court, the relationship of attorney and client is created by contract. (*Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 181 [98 Cal.Rptr. 837, 491 P.2d 421]; *Wheatland* v. *Maloney* (1930) 110 Cal.App. 288, 291 [294 P. 499] (hg. den.).) The

contract may be express or implied (7 C.J.S. 848) and the general rules of agency apply. (*Fidelity & Casualty Co.* v. *Abraham* (1945) 70 Cal. App.2d 776 [161 P.2d 689].) The attorney owes a fiduciary obligation to the client who usually is bound by the attorney's actions on his behalf. (*Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand, supra; Anderson* v. *Eaton* (1930) 211 Cal. 113 [293 P. 788].) The existence of a contract is generally an issue and question of law. (17A C.J.S. 1224.)

We do not pursue further inquiry into the nature of the label as "fact" or as "law" to be affixed to the lawyer-client status and relationship in the instant case. It is apparent that the trial court in its determination that Gray's client was *Nork* not *American* acted on the premise that only *one* lawyer-client relationship could exist vis-à-vis third parties from which assumption it follows that the attorney owes only *one* obligation to *one* client. Yet, the privileges with which we are here concerned may be *jointly* held by several persons, and as recognized by Evidence Code section 912, subdivision (b), waiver of a privilege by one of the joint holders does not bar the other joint holder from asserting it. *Lysick* clearly indicates the *duality* of the position occupied by an attorney for an insured and an insurer. The limitation of the lawyer-client privilege where the attorney represents *joint* clients is legislatively recognized in Evidence Code section 962.

In such a situation, we find relatively little guidance in the conclusionary statement of the parties themselves as to who was or was not a client. In determining that American was not a client of Gray's but only an "employer of an attorney on behalf of Dr. Nork," the trial court found significance in the statements during discovery by Gray and associates that they represented Nork and that American's claims manager and personnel in such discovery described Gray as attorney for Nork. To the contrary effect are allegations of Nork himself in his complaint against American made after their falling out. With full opportunity to evaluate his status, with new independent counsel, and in form verified by him as true Nork at least nine times in four different causes of action in apparent reference to American on the one hand, and Gray and his associates on the other and referring to the same critical period, describes Gray as "counsel for American" or American's "attorneys." Such statements, declarations and allegations, in our view, are of little value, shed little light on the basic problem before us and must be viewed carefully within the context in which they appear.

In the insured-insurer relationship, the attorney characteristically is engaged and paid by the carrier to defend the insured. The insured and

the insurer have certain obligations each to the other, as previously noted, arising from the insurance contract. Both the insured and the carrier have a common interest in defeating or settling the third party's claim. If the matter reaches litigation, the attorney appears of record for the insured and at all times represents him in terms measured by the extent of his employment.

In such a situation, the attorney has two clients whose primary, overlapping and common interest is the speedy and successful resolution of the claim and litigation. Conceptually, each member of the trio, attorney, client-insured, and client-insurer has corresponding rights and obligations founded largely on contract, and as to the attorney, by the Rules of Professional Conduct as well. The three parties may be viewed as a loose partnership, coalition or alliance directed toward a common goal, sharing a common purpose which lasts during the pendency of the claim or litigation against the insured. Communications are routinely exchanged between them relating to the joint and common purpose—the successful defense and resolution of the claim. Insured, carrier, and attorney, together form an entity—the defense team—arising from the obligations to defend and to cooperate, imposed by contract and professional duty. This entity may be conceived as comprising a unitary whole with intramural relationships and reciprocal obligations and duties each to the other quite separate and apart from the extramural relations with third parties or with the world at large. Together, the team occupies one side of the litigating arena.

Specifically in the matter before us, Gray had two clients, Nork and American. Notwithstanding the primacy of Gray's loyalty to Nork, he had a continuing obligation to American which had engaged and paid him. This obligation of Gray to American was also that of a fiduciary, perhaps secondary to Nork in the sense of priorities, but nonetheless real and continuing. The two obligations, one to insured and one to insurer, were both parts of a common, joint plan. Each of these lawyer-client relationships is endowed with confidentiality. Moreover, there is a sense in which each is independent of the other. For it may well be that in the full discharge of his obligation to his client-insurer, the attorney may communicate to the insurer objective evaluations of his client-insured, which are for the consideration only of the client-insurer in permitting it to discharge its duties to the insured under the insurance contract. Similarly there may be confidences indulged by the insured to the attorney which in turn are not intended for the insurer.

The tranquility of this coalition is disturbed however, where, as here, disagreement arises between the members. Dissatisfaction flowering into

litigation may disrupt the harmony of the arrangement. The attorney who formerly represented two clients in a special and unique relationship now must choose among alternative courses of action. He may totally withdraw from the entire relationship. He may continue to represent the insured as to third parties on pending matters, continuing at the same time to represent the insurer. Other avenues may be open to the attorney but the carefully structured relationship, and the communications between the participants which theretofore had been founded upon and exchanged in confidence, and which had been an integral part of the arrangement, thereafter are markedly different in cases where insured and insurer become antagonists. Where, as here, the insured in suing the insurer further alleges active participation, indeed collusion, in the conduct in question of attorney and insurer, the attorney must and has withdrawn from further representation of the insured in all pending matters involving the insured. The situation has changed. Partners have become adversaries. The closely knit fabric of confidentiality is torn and shredded.

In this altered and highly unusual posture of the case, what is the status of confidential communications previously exchanged between the defense group? We seek the solution to the problem in the examination of the privileges and their underlying purposes in the light of the changed relationships affecting two "clients," and the respective assertions of waiver.

## IV. *The Privileges*

The "lawyer-client" privilege is one of the "particular privileges" expressed in the Evidence Code (§§ 950-962). Where the lawyer-client relationship exists, the client may refuse to disclose, and prevent others from disclosing, a confidential communication between the client and the lawyer. (Evid. Code, § 954.) █ The often-expressed purpose of the privilege is to induce or encourage a client to disclose to his counsel fully, freely, and openly, the facts of a case. It is suggested that to withhold such a privilege "would pervert the function of counseling and would be morally reprehensible." (Louisell/Wally, Modern Cal. Discovery (2d ed.) p. 593.) It has further been said that the policy creating the privilege supports a liberal construction. (Witkin, Cal. Evidence (2d ed. 1966) p. 740.) As noted, the privilege is that of the client (Evid. Code, § 954, subd. (a)), defined by Evidence Code section 951 as "a person who, directly or through an authorized representative, consults a lawyer for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity. . . ."

Such a definition clearly encompasses both insured and insurer in the matter before us. Accordingly, any confidential communication between

the attorney and client is subject to the privilege which may be exercised by the client. The nature of the privileged communication as defined by section 952 is broad. It includes information transmitted in confidence between a client and his lawyer "by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted, and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship."

A companion, and yet separate privilege, is the work product privilege, Code of Civil Procedure section 2016, subdivision (b), which was legislatively enacted in 1963 in the following significant form: "The work product of an attorney shall not be discoverable unless the court determines that denial of discovery will unfairly prejudice the party seeking discovery in preparing his claim or defense or will result in an injustice, and any writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories *shall not be discoverable under any circumstances.*" (Italics added.) The stated purpose of the rule appears as follows in section 2016, subdivision (g): "It is the policy of this state (i) to preserve the rights of attorneys to prepare cases for trial with that degree of privacy necessary to encourage them to prepare their cases thoroughly and to investigate not only the favorable but the unfavorable aspects of such cases and (ii) to prevent an attorney from taking undue advantage of his adversary's industry or efforts."

■ The effect of the work product rule may be summarized by noting that it creates in California a qualified privilege against discovery of a general work product and an absolute privilege against disclosure of documents containing the attorney's "impressions, conclusions, opinions, or legal theories."

While the lawyer-client privilege is prompted by the need for confidentiality of the *client,* the work product rule is designed to satisfy the *attorney's* requirement for privacy.

As we have noted, Nork, American and Gray represented a defense team and as such they bore a special legal relationship of confidentiality each to the other. In the common effort to defend the malpractice actions, Gray for his part had developed files on the cases containing apparently an amalgam of materials. He did so for both his clients in an intramural sense, owing to each a continuing responsibility in his representation of

them, though he was attorney of record for Nork alone. With this in mind, we consider the contentions of Nork, Gonzales and Mercy as to waivers.

### V. *Waivers*

It is contended, and the trial court found, that waivers of the two privileges against disclosure occurred from several acts.

Nork expressly and in writing waived the lawyer-client privilege as to the enumerated files after he had sued American, asserting that they were relevant to the investigation and preparation of his case against American. He testified voluntarily in the Gonzales trial. In the Gonzales action Nork was represented by two attorneys, Harper, who was his personal attorney, interested particularly in Nork's exposure on excess judgment over the policy limits and who also represents him in his suit against American, and Brown, retained by American to represent Nork. Harper, during argument of the disclosure motion in the Gonzales trial expressly declined to waive the privileges for Nork. Nonetheless, Nork's earlier express waiver and his testimony during the Gonzales trial constituted clear waivers of the privilege, as to him.

However, as to the lawyer-client relationship Nork cannot waive for another client, American, the privileges attendant upon those intramural communications given and received in confidence between attorney Gray and client American. This fact, that waiver by Nork was not waiver by American, was recognized by the trial court which, however, by means of an "either-or" reasoning, concluded that Gray, representing Nork, could not thereupon represent American as "client," or alternatively if he did, that American was required to "make clear that they are in fact clients. . . ." As we have noted, however, the asserted waiver by Gray's discussions with Nork, and Nork's testimony in the Gonzales case, would not be binding on the client American. The record does not show that anyone with authority to act waived for American. Nor is there in the record conduct by American or its authorized representatives which indicates an intent by American, expressly or impliedly, to waive the lawyer-client privilege or the work product privilege vested in Gray as attorney for American. Gray's production of the files in question responsive to a subpoena duces tecum being involuntary, cannot constitute a waiver.

Superimposed upon the foregoing, another basis of claimed waiver is raised by the contention of Nork, Gonzales and Mercy that the services of Gray and his associates, the attorneys in the case, were sought to enable or aid in the commission of, or plan for, a crime or fraud, or alternatively,

and additionally, that the communications were "relevant to an issue of breach, by the lawyer, of a duty to the client arising out of the lawyer-client relationship." In the event of the existence of either of the foregoing combinations of circumstances, the lawyer-client privilege disappears. (Evid. Code, §§ 956 and 958.) Nork's pleadings in the Nork action are before us and charge indirectly in the second, fourth and fifth causes of action malfeasance by American and "its attorneys." We have assumed that reference is made to Gray and his associates, but the attorneys are not named as defendants in the complaint. In our consideration of the trial court's disclosure order, we do not reach, however, the question of whether the record before us warrants the conclusion that the conduct of the attorneys in question has effected a waiver of the lawyer-client privilege in the manner contemplated by sections 956 and 958.

## VI. *The Scope of The Order*

We review the nature and scope of the trial court's discovery order. It will be observed that without attempting to differentiate the various elements in the files the court proposed to turn over to the counsel for Gonzales and the third party claimants against Nork and codefendants four designated files *in their entirety* worked up by Gray and his associates on behalf of Nork and American in Nork's defense. The trial court indicated that without such an order Gonzales could not rebut Nork's testimony and contention that since he was pressured by American into taking certain "positions" which were false, Nork should not be liable to Gonzales for punitive damages. Such a conclusion, in our view, must be carefully balanced against the clearly expressed policy considerations underlying the privilege statutes.

Of great significance, as a consideration moving us to our action, is the import of the blanket order in terms of the continuity of the future litigation involving third party claimants, Nork and American. Nork's suit against American is pending. We are advised by all parties that numerous other malpractice claims remain against Nork by third party claimants in most of which the claimants are represented by Gonzales' counsel. American, under its malpractice policy with Nork, is obligated to defend Nork against these latter claims. Its duty is a continuing one. It must, if need be, pay to the policy limits claims against Nork, those which are reduced to judgment and those for which there is a negotiated settlement.

In this posture of the case, the ramifications of the issuance of the blanket order by the trial court become readily apparent. No careful dissection of the various contents of the files was made to determine that which constitute "work product," and thus may be protected under Code of Civil

Procedure section 2016, subdivision (b), that which may constitute privileged communications between Gray and his client, American, or that which may constitute protected records of committees of the Society affected by Evidence Code section 1157 or contained matters described in sections 956 and 958 of the Evidence Code. Nor was any determination made of the existence or absence of waivers with recognition of the special relationship of Nork and American vis-à-vis their counsel. The order permits delivery of the records in question into the hands of the attorneys for Gonzales, Nork and Mercy. The affected files worked up by Gray may include by way of correspondence or memoranda results of research, expert opinions, evaluations, and conclusions and theories of defense counsel which were exchanged within the context of a protected relationship. Thus the insured, by becoming an adversary of the insurer, may be converted into the key by which the total defense case is unlocked and displayed. The insurer is stripped of important tools with which to defend this and future actions while the legal obligation to defend the hostile insured continues unabated.

Such an order entered without the segregation of the affected files as above noted is contrary to the clear legislative proscriptions against disclosure and discoverability of confidential communications, attorney's impressions, conclusions, opinions, research or theories "under any circumstances." Further its enforcement would thwart the legislatively expressed policy "to preserve the rights of attorneys to prepare cases for trial with that degree of privacy necessary to encourage them to prepare their cases thoroughly and to investigate not only the favorable but the unfavorable aspects of such cases." This is equally so whether the issue arises during the discovery phase of litigation or during the testimonial phase in the trial of an action.

Such an order, whatever its momentary advantages to a particular litigant in the instant case, is not calculated to encourage the adversary process. Further, the effect of such an order would be to discourage the routine inclusion of adverse medical and legal evaluations in attorneys' files, thereby inhibiting and chilling that full, free, and objective evaluation of litigant's claims which, in an adversary context, is essential to the settlement and orderly disposition of malpractice claims.

To summarize, the trial court's order in our view is too broad and constitutes an abuse of discretion. Because of the effect on this and companion litigation, we issued our stay order to preserve the status quo.

Since then, Gonzales v. Nork and Mercy has proceeded to judgment. While ordinarily the issues herein presented, by reason of having reached

this procedural stage, would be rendered moot, this is a highly unusual case. Other actions and claims of a similar nature some of which have not yet reached the trial stage are pending before respondent court and some have not yet reached litigation. American, though not a party to the instant case, is directly and vitally affected by the trial court's order in this and in other related cases. As we have explained, no attempt has been made to segregate, clarify or select the contents of the affected files to determine whether and to what extent the privileges asserted may apply. Yet, once the contents of the files are disclosed for any purpose, they are disclosed for all purposes and for all time and the subsequent ascertainment and application of privileges become academic.

Therefore, we hold that no examination of such files or any of their contents may be allowed except after proceedings are had in accordance with the views herein expressed. Only thus can the rights of those affected be adequately protected.

Let a writ of mandate issue directing the respondent court to vacate and set aside the subject order.

Regan, J., and Goldstein, J.,* concurred.

A petition for a rehearing was denied May 10, 1974, and the opinion was modified to read as printed above. The petition of real party in interest Gonzales for a hearing by the Supreme Court was denied June 26, 1974.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.