[No. G046829. Fourth Dist., Div. Three. Jan. 15, 2013.]

BANK OF AMERICA, N.A., et al., Petitioners, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
PACIFIC CITY BANK, Real Party in Interest.

**COUNSEL**

Gilbert, Kelly, Crowley & Jennett, Jeffrey L. Crafts, Warren S. Fujimoto, Wayne I. Jeung and Peter J. Godfrey for Petitioners.

No appearance for Respondent.

Geraci Law Firm, Josh A. Lazar and Amy E. Martinez for Real Party in Interest.

OPINION

FYBEL, J.—

INTRODUCTION

When an insurer retains counsel to defend its insured, a tripartite attorney-client relationship arises among the insurer, insured, and counsel. As a consequence, confidential communications between either the insurer or the insured and counsel are protected by the attorney-client privilege, and both the insurer and insured are holders of the privilege. In addition, counsel's work product does not lose its protection when it is transmitted to the insurer.

In this case, we hold the same tripartite attorney-client relationship arises when a title insurer retains counsel to prosecute an action on behalf of the insured pursuant to the title policy. Our holding leads us to grant the petition for writ of mandate or prohibition brought by Bank of America, N.A. (B of A), and Fidelity National Title Insurance Company (Fidelity).

Fidelity is the insurer and B of A is the insured under a lender's title policy insuring a deed of trust. When B of A made a claim under the policy, Fidelity retained the law firm of Gilbert, Kelly, Crowley & Jennett LLP (GKCJ) to prosecute, on B of A's behalf, the underlying lawsuit for equitable subrogation, injunctive relief, declaratory relief, and fraud. Defendant Pacific City Bank (PCB) served subpoenas duces tecum on Fidelity's parent company and Lawyers Title Insurance Company (Lawyers Title), requesting production of documents, including communications between GKCJ and Fidelity regarding the litigation. B of A moved to quash or modify the subpoenas on the ground they sought confidential communications and documents protected by the attorney-client privilege or attorney work product doctrine. The respondent court denied the motions to quash or modify, and B of A and Fidelity brought this petition for writ of mandate or prohibition to challenge the court's order.

The respondent court erred as a matter of law. A tripartite attorney-client relationship exists among Fidelity, B of A, and GKCJ by virtue of Fidelity's retention of GKCJ to represent B of A. Confidential communications between Fidelity and GKCJ therefore are protected from disclosure by the attorney-client privilege. It does not matter that Fidelity retained GKCJ to prosecute rather than defend a lawsuit, as the respondent court stated and PCB contends, because the title insurer's obligation to protect its insured's title is the same in either case. Nor does it matter that Fidelity retained GKCJ

subject to a reservation of rights because Fidelity's reservation of rights did not create a conflict requiring *Cumis*[1] counsel, and GKCJ was not acting as *Cumis* counsel.

B of A has established it will suffer irreparable injury unless we grant extraordinary relief. We therefore grant the writ petition and order the issuance of a writ of mandate directing the respondent court to grant B of A's motions to quash or modify the subpoenas duces tecum, with further directions as set forth in the disposition.

## FACTS AND PROCEDURAL HISTORY

## I.

### The Petition's Allegations Are Deemed True.

■ In April 2012, B of A and Fidelity filed their petition for a writ of mandate or prohibition challenging the respondent court's order denying B of A's motions to quash or modify the subpoenas duces tecum. Ultimately, we issued an order to show cause. When the Court of Appeal issues an order to show cause, the real party in interest may file "a return by demurrer, verified answer, or both." (Cal. Rules of Court, rule 8.487(b)(1).) In response to the order to show cause, PCB filed an unverified "Return Brief" that included neither an answer nor a demurrer to the writ petition.

■ In the absence of a true return, all well-pleaded and verified allegations of the writ petition are accepted as true. (Code Civ. Proc., § 1094; *Caliber Bodyworks, Inc. v. Superior Court* (2005) 134 Cal.App.4th 365, 372–373, fn. 5 [36 Cal.Rptr.3d 31]; *Shaffer v. Superior Court* (1995) 33 Cal.App.4th 993, 996, fn. 2 [39 Cal.Rptr.2d 506]; *Coppinger v. Superior Court* (1982) 134 Cal.App.3d 883, 885 [185 Cal.Rptr. 24].) An unverified return does not constitute a demurrer to a mandate petition and therefore should be stricken for purposes of addressing the petition's merit. (*Universal City Studios, Inc. v. Superior Court* (2003) 110 Cal.App.4th 1273, 1287 [2 Cal.Rptr.3d 484].)

In *County of San Bernardino v. Superior Court* (1994) 30 Cal.App.4th 378, 382, footnote 6 [35 Cal.Rptr.2d 760], the real parties in interest filed a document called " 'responsive brief' " that did not respond to the formal allegations of the petition. The Court of Appeal noted its order issuing an alternative writ requested a formal return, meaning an answer or a demurrer.

---

[1] *San Diego Federal Credit Union v. Cumis Ins. Society, Inc.* (1984) 162 Cal.App.3d 358 [208 Cal.Rptr. 494].

(*Ibid.*) By filing a responsive brief, the real parties in interest did not follow the correct procedures. (*Ibid.*)

Here too, PCB filed an unverified "Return Brief" that did not respond to the formal allegations of the writ petition. Because PCB did not file a true return with a verified answer or demurrer to the allegations of the writ petition, we deem the well-pleaded and verified allegations of the petition to be true. These true allegations are set forth in parts II. and III. of this section.

PCB argues its failure to submit a true return is a mere technicality which we should overlook because B of A and Fidelity did not include with their exhibits in support of the writ petition a copy of PCB's "Supplemental Brief in Opposition to Plaintiff's Motions to Quash/Modify Pacific City Bank's Subpoenas to Fidelity and Lawyer's Title; Declaration of Josh Lazar" (PCB's supplemental brief). The failure to submit a return with a verified answer or demurrer is not a technicality, but is an integral and critical step in the procedure for determining the merit of a petition for extraordinary relief. Further, B of A and Fidelity's mistake does not excuse that of PCB; each must be judged on its own and bear its own consequence determined under the relevant standard.

As to the assertion B of A and Fidelity did not provide a complete record, California Rules of Court, rule 8.486(b)(1)(B) requires a petition seeking review of a trial court ruling to be accompanied by a record that includes "[a]ll documents and exhibits submitted to the trial court supporting and opposing the petitioner's position." This rule required B of A and Fidelity to include PCB's supplemental brief in the exhibits accompanying the writ petition. The consequence for failure to "submit the required record or explanations" is that we "*may* summarily deny a stay request, the petition, or both." (Cal. Rules of Court, rule 8.486(b)(4), italics added.) Summary denial of B of A and Fidelity's writ petition would be an overly harsh consequence for the failure to include a single pleading in a lengthy record, particularly so because B of A and Fidelity did include in the exhibits both PCB's opposition and amended opposition to the motions to quash or modify the subpoenas.[2] In addition, before issuing an order to show cause, we requested informal opposition from PCB, and, with its return, PCB submitted an appendix that included the supplemental brief and other pleadings.

While California Rules of Court, rule 8.486(b)(4) gives us discretion in deciding whether to summarily deny a writ petition for failure to submit the

---

[2] PCB also argues the record is inadequate because B of A and Fidelity submitted an unsigned declaration, an unsigned motion, and documents with counsel's handwritten notes. As required, B of A and Fidelity appear to have submitted the declaration and motion in the form in which they were filed in the respondent court. The handwritten notes appear on two pages of the record, and are illegible.

required record, the failure to file a true return gives us no option but to accept the well-pleaded allegations of the writ petition as true. Unlike a document omitted from the exhibits, a verified answer to the writ petition cannot be supplied from another source, certainly not from the petitioner. B of A and Fidelity should have included PCB's supplemental brief in the exhibits to their writ petition, but their failure to do so does not excuse PCB's failure to file a true return.

## II.

### Underlying Facts

In July 2007, Helena A. Cho applied for a loan from B of A to refinance her home mortgage. At that time, the property was encumbered by a $630,000 deed of trust in favor of American Sterling Bank, which had been recorded on November 10, 2005.

B of A approved the refinance loan, under the terms of which the loan proceeds would be used to pay off the American Sterling Bank loan. B of A's loan would be secured by a first deed of trust. On October 19, 2007, Cho executed a $608,000 promissory note in favor of B of A. On October 30, the loan funded, and a deed of trust securing the loan was recorded in the Orange County Recorder's Office. B of A paid a little over $598,000 to satisfy the American Sterling Bank loan.

In connection with the B of A loan to Cho, Transnation Title Insurance Company (Transnation) issued a title insurance policy to B of A (the Transnation Policy) insuring the priority of B of A's deed of trust over any other lien or encumbrance. The Transnation Policy provided that Transnation would defend B of A in any litigation involving a covered claim and that Transnation had the right to institute and prosecute any action to establish the lien of the insured mortgage or to prevent or reduce damage or loss to B of A. Transnation was acquired by Lawyer's Title, which in turn was acquired by Fidelity.

Unbeknownst to B of A, at about the same time that Cho refinanced with B of A, Cho (on behalf of her business DC Marketing) obtained a $1.5 million business line of credit from PCB. The line of credit was secured not only by Cho's business assets, but also by a deed of trust recorded against Cho's home on October 25, 2007, five days before the recordation of B of A's deed of trust.

In November 2010, PCB recorded a notice of default under its deed of trust and sent the notice to B of A in December 2010. In February 2011, PCB

recorded a notice of trustee's sale, scheduling the sale for the following month. To protect its security interest, B of A retained the law firm of Miles, Bauer, Bergstrom & Winters, LLP (MBBW). PCB refused MBBW's request to postpone the sale and purchased the property with a full credit bid.

Two days before the scheduled sale date, MBBW, on behalf of B of A, tendered to Fidelity a claim under the Transnation Policy. Fidelity accepted the claim and retained temporary counsel to commence the underlying action to subrogate B of A to the position of the American Sterling Bank encumbrance that B of A had satisfied. In April 2011, temporary counsel filed the complaint for equitable subrogation and declaratory relief. In June, Fidelity retained GKCJ to represent B of A in the underlying action. Fidelity is paying GKCJ's fees to represent B of A.

B of A, represented by GKCJ, filed a first amended complaint asserting causes of action for equitable subrogation, injunctive relief, declaratory relief, and fraud.

The writ petition alleges: "During GKCJ's representation of [B of A] in the underlying action, GKCJ attorneys have communicated extensively with Fidelity regarding the facts of the underlying action, the status of the underlying action, [B of A]'s communications, GKCJ's litigation strategy, GKCJ's assessment of the strengths and weaknesses of each party's case and GKCJ's recommendations and opinions regarding settlement and other possible resolutions of the underlying action. GKCJ has also transmitted its research and other written work product to Fidelity. Further, the great majority of GKCJ's communications with Fidelity have been with Lindsy Doucette, who is a licensed attorney, and include Ms. Doucette's mental thoughts and impressions as an attorney. GKCJ and its attorneys have believed at all times that there was a tripartite relationship between [B of A], Fidelity and GKCJ and GKCJ's communications with Fidelity were protected by the attorney-client privilege and the attorney work product privilege."

### III.

### Procedural History

In January 2012, PCB served deposition subpoenas duces tecum on Fidelity's parent company, Fidelity National Financial, Inc., and on Lawyer's Title. The subpoenas were essentially the same and sought documents that included communications between GKCJ and Fidelity.

B of A moved to quash or modify the subpoenas duces tecum (the motions to quash) to exclude communications between GKCJ and Fidelity on the ground

they were protected by the attorney-client privilege and/or were protected attorney work product. B of A argued in the motions to quash and supporting documents that GKCJ had been hired by Fidelity and that a tripartite attorney-client relationship existed among B of A, GKCJ, and Fidelity. B of A's moving papers included a declaration of counsel that GKCJ was retained by Fidelity to represent B of A under the Transnation Policy.

PCB filed oppositions to the motions to quash and argued, among other things, the tripartite attorney-client relationship was destroyed because Fidelity was providing coverage to B of A under a reservation of rights.

In March 2012, at the hearing on the motions to quash, the respondent court requested B of A to prepare and file (1) a declaration of Fidelity's claims counsel, pertaining to Fidelity's retention of GKCJ and (2) a privilege log of all communications between GKCJ and Fidelity. The hearing on the motions to quash was continued to April.

In compliance with the court's request, B of A filed a declaration from Lindsy Doucette, claims counsel at Fidelity, setting forth facts regarding its retention of GKCJ. The declaration stated, "Fidelity retained GKCJ to represent [B of A] and Fidelity in this matter in a tripartite relationship pursuant to the terms of the [Transnation] Policy by way of referral on or about May 4, 2011." As to Fidelity's general relationship with GKCJ, the declaration stated: "Pursuant to the November 10, 2010 Letter of Engagement, it was my impression and intent that Fidelity and GKCJ, as retained counsel, maintained an attorney-client relationship for matters Fidelity referred to GKCJ and that all communications between Fidelity and GKCJ referring to or relating to matters referred to GKCJ would be confidential and subject to the attorney-client privilege." B of A also filed a 36-page privilege log of all communications between GKCJ and Fidelity that were sought by the subpoenas duces tecum.

At the resumption of the hearing, the respondent court denied the motions to quash. The court ruled there was no attorney-client relationship between GKCJ and Fidelity because GKCJ was retained to *prosecute* the underlying action as opposed to *defending* an existing action. The court stated, "[t]here is [a] distinction between an equitable subrogation case and quiet title case, a case in which one is defending an action as opposed to one in which one is prosecuting an action . . . ." According to the respondent court, Fidelity did not have a "favored position" or "sacred role" in the litigation.

In its minute order, the respondent court ruled: "1. On its own motion the court determines that the motion is properly a motion for [a] protective order respecting the documents identified on the privilege logs submitted and

prepared by plaintiff. [¶] 2. The court finds that none of the documents listed on the privilege log (Exhibit A to defendant's March 28, 2012 'Amendment to Opposition,' etc.) is privileged and shall be produced to defense counsel as specified below. [¶] 3. The court finds that none of the documents listed on the privilege log (attached to plaintiff's April 3, 2012 'Supplemental Brief,' etc.) is privileged and shall be produced to defense counsel as specified below. [¶] 4. The court stays its foregoing orders of production until April 27, 2012."

## STANDARD OF REVIEW

The standard of review for a discovery order is abuse of discretion. (*Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 733 [101 Cal.Rptr.3d 758, 219 P.3d 736] (*Costco*).) "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478–479 [243 Cal.Rptr. 902, 749 P.2d 339].)

"The abuse of discretion standard . . . measures whether, given the established evidence, the act of the lower tribunal falls within the permissible range of options set by the legal criteria. 'The scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action . . . ." Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion.' " (*Department of Parks & Recreation v. State Personnel Bd.* (1991) 233 Cal.App.3d 813, 831 [284 Cal.Rptr. 839].)

"[W]hen a trial court's decision rests on an error of law, that decision is an abuse of discretion." (*People v. Superior Court (Humberto S.)* (2008) 43 Cal.4th 737, 746 [76 Cal.Rptr.3d 276, 182 P.3d 600].) It is an abuse of discretion to apply the wrong legal standard. (*Costco, supra,* 47 Cal.4th at p. 733.)

## DISCUSSION

### I.

### A Tripartite Attorney-client Relationship Exists Among Fidelity, B of A, and GKCJ.

PCB argues the respondent court's finding that no attorney-client relationship existed between Fidelity and GKCJ was supported by substantial

evidence. B of A and Fidelity's writ petition alleges that, in June 2011, "Fidelity retained GKCJ to represent [B of A] and GKCJ took over [B of A]'s representation in the underlying action," and that "Fidelity is paying GKCJ for its representation of [B of A] in the underlying action." We deem these allegations to be true because PCB did not answer them. In addition, B of A and Fidelity submitted a declaration confirming that Fidelity retained GKCJ to represent B of A in the underlying action pursuant to the terms of the Transnation Policy.

█ Fidelity's retention of GKCJ to represent B of A is sufficient to establish a tripartite attorney-client relationship between Fidelity, B of A, and GKCJ. (*Gafcon, Inc. v. Ponsor & Associates* (2002) 98 Cal.App.4th 1388, 1406 [120 Cal.Rptr.2d 392] ["In California, it is settled that absent a conflict of interest, an attorney retained by an insurance company to defend its insured under the insurer's contractual obligation to do so represents and owes a fiduciary duty to both the insurer and insured."]; *Gulf Ins. Co. v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone* (2000) 79 Cal.App.4th 114, 127 [93 Cal.Rptr.2d 534] (*Gulf Ins.*) ["Counsel retained by an insurer to defend its insured has an attorney-client relationship with the insurer."]; *State Farm Mutual Automobile Ins. Co. v. Federal Ins. Co.* (1999) 72 Cal.App.4th 1422, 1429 [86 Cal.Rptr.2d 20] (*State Farm Mutual*) ["Between the attorney and the insurer who retained the attorney and paid for the defense, there exists a separate attorney-client relationship endowed with confidentiality."].) The principles regarding an insurer's duties to provide counsel for the insured are the same under title insurance policies as under general liability policies. (*Lambert v. Commonwealth Land Title Ins. Co.* (1991) 53 Cal.3d 1072, 1077 [282 Cal.Rptr. 445, 811 P.2d 737]; *Israelsky v. Title Ins. Co.* (1989) 212 Cal.App.3d 611, 620 [261 Cal.Rptr. 72].)

█ In *American Mut. Liab. Ins. Co. v. Superior Court* (1974) 38 Cal.App.3d 579, 591–592 [113 Cal.Rptr. 561], the court explained the nature of the tripartite attorney-client relationship: "In the insured-insurer relationship, the attorney characteristically is engaged and paid by the carrier to defend the insured. The insured and the insurer have certain obligations each to the other . . . arising from the insurance contract. Both the insured and the carrier have a common interest in defeating or settling the third party's claim. If the matter reaches litigation, the attorney appears of record for the insured and at all times represents him in terms measured by the extent of his employment. [¶] In such a situation, the attorney has two clients whose primary, overlapping and common interest is the speedy and successful resolution of the claim and litigation. Conceptually, each member of the trio, attorney, client-insured, and client-insurer has corresponding rights and obligations founded largely on contract, and as to the attorney, by the Rules of Professional Conduct as well. The three parties may be viewed as a loose partnership, coalition or alliance directed toward a common goal, sharing a

common purpose which lasts during the pendency of the claim or litigation against the insured. Communications are routinely exchanged between them relating to the joint and common purpose—the successful defense and resolution of the claim. ■ Insured, carrier, and attorney, together form an entity—the defense team—arising from the obligations to defend and to cooperate, imposed by contract and professional duty. This entity may be conceived as comprising a unitary whole with intramural relationships and reciprocal obligations and duties each to the other quite separate and apart from the extramural relations with third parties or with the world at large. Together, the team occupies one side of the litigating arena."

That is the situation in this case. Fidelity retained GKCJ to represent B of A. As a consequence, a tripartite attorney-client relationship among them arose; Fidelity, B of A, and GKCJ formed a "loose partnership, coalition or alliance" that was directed to the "common goal" of protecting B of A's security position, and communications exchanged among them are privileged. (*American Mut. Liab. Ins. Co. v. Superior Court, supra,* 38 Cal.App.3d at p. 592.)

■ Contrary to PCB's argument, it does not matter whether there is a formal retainer agreement between Fidelity and GKCJ. A formal contract is not required to create an attorney-client relationship. (*Gulf Ins., supra,* 79 Cal.App.4th at p. 126.) Retaining GKCJ to represent B of A was enough in itself to establish the tripartite attorney-client relationship. Thus, "[GKCJ] represents two clients, the insured and the insurer." (*State Farm Mutual, supra,* 72 Cal.App.4th at p. 1429.)

## II.

### The Tripartite Attorney-client Relationship Exists Notwithstanding Fidelity's Reservation of Rights.

PCB argues a tripartite attorney-client relationship does not exist because Fidelity agreed to provide counsel for B of A under a reservation of rights. According to PCB, the tripartite attorney-client relationship is limited to the situation in which an insurer, without a reservation of rights, hires an attorney to defend the insured from a liability claim.

■ A reservation of rights in itself does not create a disqualifying conflict requiring the appointment of *Cumis* counsel. (*James 3 Corp. v. Truck Ins. Exchange* (2001) 91 Cal.App.4th 1093, 1108 [111 Cal.Rptr.2d 181].) " 'If the issue on which coverage turns is independent of the issues in the underlying case, *Cumis* counsel is not required.' " (*Ibid.*) "[N]ot every reservation of

rights entitles an insured to select *Cumis* counsel. There is no such entitlement, for example, where the coverage issue is independent of, or extrinsic to, the issues in the underlying action [citation] or where the damages are only partially covered by the policy. [Citations.]" (*Dynamic Concepts, Inc. v. Truck Ins. Exchange* (1998) 61 Cal.App.4th 999, 1006 [71 Cal.Rptr.2d 882].)

Fidelity made its reservation of rights because B of A submitted its claim to Fidelity only two days before the March 25 foreclosure sale. Whether B of A promptly notified Fidelity of the claim does not appear to be related to any of the issues in the underlying lawsuit against PCB for equitable subrogation, injunctive relief, declaratory relief, and fraud.

In addition, the record does not support a finding GKCJ was acting as *Cumis* counsel, that is, independent counsel, for B of A. (See Civ. Code, § 2860, subd. (a).) Fidelity retained GKCJ to represent B of A, there is no evidence B of A independently retained GKCJ, B of A made no demand for *Cumis* counsel, and neither Fidelity nor B of A has ever asserted GKCJ has been acting as *Cumis* counsel.

PCB relies on *First Pacific Networks, Inc. v. Atlantic Mutual Ins. Co.* (N.D.Cal. 1995) 163 F.R.D. 574, to assert "there is [no] longer any confidential relationship between an insured and the insurance company after the insurer issues its reservation of rights . . . ." The magistrate judge in that case concluded that no attorney-client relationship existed between the insurer and the insured's *Cumis* counsel. (*Id.* at p. 578.) The magistrate judge did not conclude the insurer's reservation of rights automatically created a disqualifying conflict requiring the retention of *Cumis* counsel, and such a conclusion would be contrary to California law.[3]

■ But assuming for purposes of analysis the reservation of rights in this case did create a disqualifying conflict, PCB's argument fails for two fundamental reasons. First, the right to invoke the conflict would belong solely to B of A. "The right to independent representation paid for by the insurer in the circumstances found in the *Cumis* decision was expressly stated by the *Cumis* court to be a right belonging to the insured [citation], not the insured's adversary." (*McGee v. Superior Court* (1985) 176 Cal.App.3d 221, 228 [221 Cal.Rptr. 421].) PCB, as B of A's adversary, cannot assert B of A's right to *Cumis* counsel in order to create a waiver of the attorney-client privilege and attorney work product doctrine as to communications between GKCJ and the insurer, Fidelity.

---

[3] California state appellate courts are not bound by federal court decisions, except for those of the United States Supreme Court. (*People v. Avena* (1996) 13 Cal.4th 394, 431 [53 Cal.Rptr.2d 301, 916 P.2d 1000]; see 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 507, pp. 570–571.)

Second, if GKCJ were serving as *Cumis* counsel, then it and B of A would have a duty "to disclose to the insurer all information concerning the action except privileged materials relevant to coverage disputes, and timely to inform and consult with the insurer on all matters relating to the action." (Civ. Code, § 2860, subd. (d).) "Any information disclosed by the insured or by independent counsel is not a waiver of the privilege as to any other party." (*Ibid.*)

## III.

### The Tripartite Attorney-client Relationship Exists When the Title Insurer Retains Counsel to Prosecute Litigation on Behalf of the Insured Under the Policy.

■ At the hearing in April 2012, the respondent court found no attorney-client relationship between GKCJ and Fidelity existed because GKCJ was retained to prosecute the underlying action as opposed to defending an existing one. The court stated, "[t]here is [a] distinction between an equitable subrogation case and quiet title case, a case in which one is defending an action as opposed to one in which one is prosecuting an action . . . ." The respondent court erred as a matter of law in making this artificial distinction.

■ We turn first to the Transnation Policy because that is the contract setting forth Fidelity's obligations to B of A. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264–1265 [10 Cal.Rptr.2d 538, 833 P.2d 545] [insurance policies "are still contracts to which the ordinary rules of contractual interpretation apply"].) The Transnation Policy is an American Land Title Association (ALTA) loan policy, form 1191-187. Paragraph 5 of the conditions section of the Transnation Policy is entitled "Defense and Prosecution of Actions" and has two components. First, paragraph 5(a) provides (in relevant part) that "the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured." Second, paragraph 5(b) provides: "The Company shall have the right, in addition to the options contained in Section 7 of these Conditions, at its own cost, to *institute and prosecute any action or proceeding* or to do any other act that in its opinion may be necessary or desirable to establish the Title or the lien of the Insured Mortgage, as insured, or to prevent or reduce loss or damage to the Insured." (Italics added.)

■ Thus, the Transnation Policy not only obligates Fidelity to defend B of A, but, as a standard ALTA lender's policy, also gives Fidelity the right to initiate and prosecute litigation, such as a lawsuit to quiet title against an

adverse claim. (See Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2012) ¶ 6:2668, p. 6H-31 (rev. # 1, 2012).) "[T]he [title] insurer may undertake legal action to eliminate the defect or perfect the insured's title. . . . If legal action is pursued, it may take the form of, inter alia, a quiet title action, a declaratory relief action, or an action in probate court for a declaration regarding the interpretation of a trust or will." (Akawie et al., Cal. Title Insurance Practice (Cont.Ed.Bar 2d ed. 2011) § 12.53, p. 565 (rev. 6/08).)

In *Jarchow v. Transamerica Title Ins. Co.* (1975) 48 Cal.App.3d 917, 924, 927 [122 Cal.Rptr. 470] (*Jarchow*), the court examined a title insurer's duty to prosecute litigation to protect an insured. In that case, a title insurer denied the insured's request to initiate a lawsuit to eliminate a neighbor's easement. (*Id.* at p. 924.) The Court of Appeal concluded the insured's complaint stated a claim for bad faith and emotional distress because the insurer breached its duty to take affirmative measures to eliminate the easement and provide clear title. (*Id.* at pp. 940, 943.) The court examined the duty to defend provision of the title policy[4] and explained: "This provision of the title policy sets forth two obligations of the insurer: (1) To defend the insured's title if a third party claims, in a judicial proceeding, an interest insured against by the policy, and (2) in the event that a third party claimant chooses not to litigate his claim, to take affirmative action (by filing an action to quiet title or by offering to compromise the third party's claim) to provide the insured with title as stated in the policy. The obligations to defend and to 'take other appropriate action' are kindred duties designed to achieve the same objective: the integrity of the insured's title. Since these duties address the same fundamental concern, both must be equally accessible to insureds; legal rules regarding application of the one must, likewise, apply to the other." (48 Cal.App.3d at pp. 941–942.)

The *Jarchow* court noted, "[t]he case law regarding a title insurer's bifurcated obligation to seek judicial determination of insured-against title defects deals almost exclusively with the duty to defend." (*Jarchow, supra,* 48 Cal.App.3d at p. 942.) In *Jarchow*, however, the third party did not sue the insured. Instead, the third party persuaded the city planning commission to impose restrictions on the insured's ability to develop the property protected by the policy. (*Ibid.*) In such a situation—when the insurer must prosecute a lawsuit to protect its insured's interest—the insurer's duties are the same as

---

[4] The policy in *Jarchow* was a standard form California Land Title Association (CLTA) standard coverage policy, No. 4000-1963 (amended 1969), with the following provision on the insurer's duty to defend: " 'The Company, at its own cost and *without undue delay* shall provide (1) for the defense of the Insured in all litigation consisting of actions . . . commenced against the Insured . . . ; or (2) *for such action as may be appropriate to establish the title . . . as insured,* which litigation . . . is founded upon an alleged defect, lien or encumbrance insured against by this policy. . . .' " (*Jarchow, supra,* 48 Cal.App.3d at p. 941.)

when an insurer is called upon to provide a defense to a lawsuit brought by a third party. (*Id.* at pp. 941–942.)

Although *Jarchow* did not concern the tripartite attorney-client relationship among insurer, insured, and counsel, the principle that a title insurer's duties to defend and to initiate a lawsuit are "kindred duties" addressing "the same fundamental concern" (*Jarchow, supra,* 48 Cal.App.3d at pp. 941–942) is equally relevant here. Whether a title insurer is defending an action or prosecuting one, the object of protecting the integrity of the insured's title is the same. There is no logical reason why a tripartite attorney-client relationship should exist in one case but not the other.

To distinguish between defending an action and prosecuting one would deny a tripartite attorney-client relationship from ever forming in many situations in which a title insurer takes action to protect its insured's title. Both CLTA and ALTA policies have provisions for defense and prosecution of lawsuits. (See 3 Cal. Insurance Law & Practice (2012 ed.) Title Insurance, appen. A, pp. 39-87 to 39-88 (rel. 64-4/2009) [CLTA standard policy]; *id.,* appen. B, p. 39-104 (rel. 64-4/2009) [ALTA owner's policy]; *id.,* appen. C, pp. 39-120 to 39-121 (rel. 64-4/2009) [ALTA loan policy].)

As both *Jarchow* and this case illustrate, it often is necessary for the title insurer to initiate a quiet title, declaratory relief, or equitable subrogation action to protect the insured's title. Here, a lawsuit by PCB against B of A was not forthcoming; the foreclosure sale extinguished B of A's lien, and, therefore, the means available to Fidelity to protect its insured's interest was to prosecute the underlying action for equitable subrogation and declaratory relief. If a tripartite attorney-client relationship did not arise in such a situation, the title insurer would be unable to communicate with counsel retained to represent the insured without the risk of being forced to disclose confidential or privileged information.

Citing *In re Imperial Corp. of America* (S.D.Cal. 1995) 167 F.R.D. 447, PCB argues, "[e]xisting case law limits the 'tripartite' relationship to the narrow situation where an insurer, *without a reservation of rights,* hires an attorney to *defend* the insured from a liability claim." *In re Imperial Corp. of America* is inapposite: The issue in that case was whether, under federal law, the tripartite attorney-client relationship among insurer, insured, and counsel arises in litigation under a directors and officers liability policy. (*Id.* at p. 451.) The court concluded such a tripartite relationship did not arise because the directors and officers liability policy did not include a duty to defend or give the insurer the right to retain counsel for the insured. (*Ibid.*) Thus, the insured's counsel did not have an attorney-client relationship with the insurer. (*Id.* at p. 452.)

It is true that California opinions dealing with the tripartite attorney-client relationship have done so in the context of a liability policy. (E.g., *State Farm Mutual, supra,* 72 Cal.App.4th 1422 [automobile liability policy]; *American Mut. Liab. Ins. Co. v. Superior Court, supra,* 38 Cal.App.3d 579 [attorney malpractice liability policy].) But none has limited the relationship to liability policies or rejected the relationship when a title insurer initiates litigation on behalf of the insured pursuant to the terms of the title policy. In addition to the duty to defend, standard title policies, such as the Transnation Policy, include the insurer's "right" to initiate litigation to protect the insured's title.

PCB argues we should reject B of A and Fidelity's request to create a new type of protected communications and defer the matter to the Legislature. The type of communications we are protecting—those between attorney and client—is not new; rather, we are concluding that Fidelity and GKCJ have an attorney-client relationship by virtue of Fidelity's retention of GKCJ to represent B of A.

## IV.

### Fidelity Did Not Waive B of A's Right to Assert the Attorney-client Privilege and Attorney Work Product Doctrine.

PCB argues Fidelity waived any right to object to production of privileged documents and information because it did not bring its own motion to quash the subpoenas or serve objections to them. For the same reason, PCB argues Fidelity is not a "proper party" to the writ petition.

The attorney-client privilege may be claimed only by the holder of the privilege, a person who is authorized by the holder to claim the privilege, or the person who was the attorney at the time of the communication. (Evid. Code, § 954.) As relevant here, the " 'holder of the privilege' " is defined as the client. (*Id.,* § 953.)

We have concluded a tripartite attorney-client relationship exists among Fidelity, B of A, and GKCJ; they are "a unitary whole" and share a "common purpose" lasting "during the pendency of the claim or litigation." (*American Mut. Liab. Ins. Co. v. Superior Court, supra,* 38 Cal.App.3d at p. 592.) As a consequence, B of A and Fidelity are joint clients of GKCJ. "Each of the joint clients holds the privilege protecting their confidential communications with the attorney; one client may not waive the privilege without the consent of the other." (*Roush v. Seagate Technology, LLC* (2007) 150 Cal.App.4th 210, 223 [58 Cal.Rptr.3d 275].) Since B of A, one joint holder of the attorney-client privilege, did move to quash the subpoenas and

serve objections to the requests for production, it was unnecessary that Fidelity do the same to prevent disclosure of privileged communications and attorney work product.

For similar reasons, we need not decide whether Fidelity is a proper party to the writ petition. There is no question B of A is a proper party, and any relief we grant of necessity would extend to Fidelity even if it did not have standing to challenge the respondent court's order.

## V.

## B of A Did Not Waive the Attorney-client Privilege or the Attorney Work Product Doctrine.

Earlier in the litigation, B of A asserted the attorney-client privilege and the attorney work product doctrine in response to interrogatories propounded by PCB. In March 2012, the respondent court, in ruling on PCB's motion to compel further responses to those interrogatories, ruled that B of A had waived privilege objections by failing to submit a privilege log as required by a case management order from June 2011. B of A challenged the respondent court's ruling by petition for writ of mandate (*Bank of America, N.A. v. Superior Court* (Apr. 5, 2012, G046691, petn. den.)), which we summarily denied.[5]

PCB argues B of A waived the attorney-client privilege and work product doctrine as to documents and information sought by the subpoenas duces tecum because B of A failed to file a privilege log in response to the earlier-served interrogatories. PCB asserts, "it would be contradictory for this Court to hold that Petitioner could obtain a protective order preventing disclosure of the very documents to which it affirmed that BofA had waived any privilege by failure to comply with the trial court's June 15, 2011 Case Management Order."

 A summary denial of a petition for writ of mandate is not a denial on the merits and does not become law of the case. (*Kowis v. Howard* (1992) 3 Cal.4th 888, 893–894 [12 Cal.Rptr.2d 728, 838 P.2d 250].) By having summarily denied B of A's prior writ petition, we are not "hamstrung into deciding" this writ petition against B of A. (*Amalgamated Bank v. Superior Court* (2007) 149 Cal.App.4th 1003, 1020 [57 Cal.Rptr.3d 686].)

PCB argues too that B of A waived any claims of attorney-client privilege and attorney work product by failing to submit a privilege log in response to

---

[5] We have granted PCB's request to take judicial notice of the proceedings in *Bank of America, N.A. v. Superior Court, supra,* G046691.

the subpoenas. The requirement of submitting a privilege log was imposed by the respondent court's June 15, 2011 case management order, which stated that "in respect to all future discovery responses . . . , all objections on the grounds that the information sought by any written discovery is contained in attorney client privileged documents [or] documents protected by the work product doctrine . . . will be sustained on the following basis only. [¶] *Within seven days of the response or within seven days of this order, whichever has come later,* the objecting parties are ordered both to serve on counsel and *simultaneously to file in court,* a privilege log . . . ." The order states the court will deem any privilege objection to have been withdrawn if the privilege log fails to specify documents to specifically numbered discovery requests.

When the case management order was made and when the respondent court ruled on the motions to quash, the Code of Civil Procedure did not require preparation of a privilege log to preserve objections based on privilege or attorney work product. At those times, case law held the term "privilege log" did not appear in the Code of Civil Procedure and was "commonly used by courts and attorneys to express the requirements of subdivision (g)(3) of [Code of Civil Procedure former] section 2031 [(now Code Civ. Proc., § 2031.240, subd. (b))]." (*Hernandez v. Superior Court* (2003) 112 Cal.App.4th 285, 292 [4 Cal.Rptr.3d 883]; see *People ex rel. Lockyer v. Superior Court* (2004) 122 Cal.App.4th 1060, 1073 [19 Cal.Rptr.3d 324]; *Best Products, Inc. v. Superior Court* (2004) 119 Cal.App.4th 1181, 1188–1189 [15 Cal.Rptr.3d 154].)

 . Recent legislation amended subdivision (c)(1) of Code of Civil Procedure section 2031.240 to require the preparation of a privilege log "if necessary" to "provide sufficient factual information for other parties to evaluate the merits" of a claim of privilege or protected work product. (Legis. Counsel's Dig., Assem. Bill No. 1354 (2011–2012 Reg. Sess.); see Stats. 2012, ch. 232, § 1.) The amendment did not become effective until January 1, 2013 (Cal. Const., art. IV, § 8, subd. (c)(1) [effective date of new statutes is Jan. 1, following 90 days after enactment]), and section 2031.240, subdivision (c)(1) applies only to responses to inspection demands.

 A court has no authority to issue courtroom rules that are in conflict or inconsistent with statute. (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 967 [67 Cal.Rptr.2d 16, 941 P.2d 1203]; *Pacific Trends Lamp & Lighting Products, Inc. v. J. White, Inc.* (1998) 65 Cal.App.4th 1131, 1134–1135 [76 Cal.Rptr.2d 918].) To the extent the case management order imposed requirements or conditions greater than or inconsistent with the Code of Civil Procedure in effect at the time to preserve claims of privilege and work product, the order was invalid. (See *Hernandez v. Superior Court, supra,* 112 Cal.App.4th at pp. 292–293 [court rule requiring creation of privilege log in responding to interrogatories is invalid].)

In any case, B of A did not file a *response* to the subpoenas duces tecum, but filed *motions to quash* (Code Civ. Proc., § 1987.1), which the respondent court called motions for protective orders (*id.*, § 2031.060). Thus, the case management order, even if valid, did not require B of A to submit a privilege log. When, at the hearing in March 2012, the respondent court requested that B of A prepare and file a privilege log of all communications between GKCJ and Fidelity, B of A did so.

## VI.

### The Communications Identified in B of A's Privilege Log Are Protected by the Attorney-client Privilege.

Confidential communications between lawyer and client are broadly protected from disclosure. (Evid. Code, §§ 950–954.) "The attorney-client privilege, set forth at Evidence Code section 954, confers a privilege on the client 'to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer . . . .' The privilege 'has been a hallmark of Anglo-American jurisprudence for almost 400 years.' [Citation.] Its fundamental purpose 'is to safeguard the confidential relationship between clients and their attorneys so as to promote full and open discussion of the facts and tactics surrounding individual legal matters. [Citation.] . . . .' " (*Costco, supra*, 47 Cal.4th at p. 732.)

The privilege protects communications between legal professionals within the law firm representing the client (*Fireman's Fund Ins. Co. v. Superior Court* (2011) 196 Cal.App.4th 1263, 1273–1274 [127 Cal.Rptr.3d 768]), communications between a business entity and its in-house counsel acting in a legal capacity (*Alpha Beta Co. v. Superior Court* (1984) 157 Cal.App.3d 818, 825 [203 Cal.Rptr. 752]), and communications made during preliminary consultation, regardless whether the attorney is ultimately retained (*Hooser v. Superior Court* (2000) 84 Cal.App.4th 997, 1003 [101 Cal.Rptr.2d 341]). The privilege protects communications made by electronic means, such as e-mail. (Evid. Code, § 917, subd. (b).)

"The party claiming the privilege has the burden of establishing the preliminary facts necessary to support its exercise, i.e., a communication made in the course of an attorney-client relationship. [Citations.] Once that party establishes facts necessary to support a prima facie claim of privilege, the communication is presumed to have been made in confidence and the opponent of the claim of privilege has the burden of proof to establish the communication was not confidential or that the privilege does not for other reasons apply. [Citations.]" (*Costco, supra*, 47 Cal.4th at p. 733.)

B of A met its burden. We have reviewed the privilege log appearing at pages 294 through 329 of volume II of the exhibits submitted with the writ petition. Every entry on the log is a communication (either letter or e-mail) between B of A and GKCJ, Fidelity and GKCJ, attorneys at GKCJ, or an attorney and legal assistant at GKCJ. The first communication was made on April 29, 2011, and concerns retention of GKCJ, and the last communication was made on March 29, 2012, and concerns transmission of strategic documents. There is no indication that any communication was disclosed to a third party other than those "present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information . . . ." (Evid. Code, § 952.)

 The attorney-client privilege would not be defeated if the confidential communications contained material discoverable by other means. "The attorney-client privilege attaches to a confidential communication between the attorney and the client and bars discovery of the communication irrespective of whether it includes unprivileged material." (*Costco, supra,* 47 Cal.4th at p. 734.)

 Citing *Coito v. Superior Court* (2012) 54 Cal.4th 480, 502 [142 Cal.Rptr.3d 607, 278 P.3d 860] (*Coito*), PCB argues it is necessary to submit the documents identified on the privilege log to the respondent court for in camera inspection to determine whether any are absolute work product. An in camera inspection is not necessary or permitted. In *Coito,* the California Supreme Court confirmed a trial court may, if necessary, conduct an in camera inspection to determine whether absolute or qualified work product protection applies to the material in dispute. (*Ibid.*) The documents on the privilege log in this case are communications protected by the attorney-client privilege and are not subject to disclosure for in camera inspection. (*Costco, supra,* 47 Cal.4th at pp. 736–737 [court may not compel in camera disclosure of document for which privilege is asserted].)

Documents identified as Nos. 13, 44, 49, 74–77, 112, 114, 115, 117–119 are e-mails and include the description "Re: Transmission of Strategic Documents/Pleadings including analysis and legal assessment" or "Re: Transmission of File Documents including analysis and legal assessment." We read these entries as identifying communications which themselves include analysis and legal assessment, not merely as cover letters for the transmission of other documents that are not protected by the attorney-client privilege or work product doctrine.

 Material that includes an attorney's analysis and legal assessment constitutes attorney work product. Under Code of Civil Procedure section 2018.030, subdivision (a), "[a] writing that reflects an attorney's impressions,

conclusions, opinions, or legal research or theories is not discoverable under any circumstances." ▮ Such writings enjoy absolute protection. (*Coito, supra*, 54 Cal.4th at p. 485.) The documents so identified and described in the privilege log as Nos. 13, 44, 49, 74–77, 112, 114, 115, 117–119 are therefore protected as attorney work product in addition to receiving protection by the attorney-client privilege. If those documents transmitted other documents and pleadings, apart from the communications themselves, for which B of A and Fidelity assert work product protection, then those documents and pleadings must be brought to the respondent court's attention and analyzed separately. (*Costco, supra*, 47 Cal.4th at p. 735 [transmission of unprivileged material from attorney to client does not protect the material from discovery].) In that case, in camera inspection of the transmitted documents and pleadings might be necessary to determine whether absolute or qualified work product protection applies. (*Coito, supra*, at p. 502.) As we have noted, we do not read the privilege log in that manner.

PCB challenges the privilege log as unverified and asserts B of A and Fidelity have not submitted evidence to support the claim of privilege. The respondent court did not require B of A to verify the privilege log and, though inapplicable, Code of Civil Procedure section 2031.240, subdivision (b) does not require a verification. B of A met its evidentiary burden in the respondent court of proving a tripartite attorney-client relationship by presenting evidence that Fidelity retained GKCJ to represent B of A. In addition, B of A and Fidelity allege in their writ petition that GKCJ attorneys communicated extensively with Fidelity regarding the facts of the underlying action, the status of the underlying action, communications, GKCJ's litigation strategy, GKCJ's assessment of the strengths and weaknesses of each party's case, and GKCJ's recommendations and opinions regarding settlement and other possible resolutions of the underlying action. B of A and Fidelity allege: "GKCJ has also transmitted its research and other written work product to Fidelity. Further, the great majority of GKCJ's communications with Fidelity have been with Lindsy Doucette, who is a licensed attorney, and include Ms. Doucette's mental thoughts and impressions as an attorney." We accept those allegations as true because PCB did not file a return with a verified answer denying them.

## VII.

### Review by Extraordinary Writ Is Warranted.

▮ Review of a discovery ruling by extraordinary writ will be granted if the ruling threatens immediate harm, such as loss of a privilege against disclosure, for which no other remedy exists. (*Doe v. Superior Court* (2011) 194 Cal.App.4th 750, 754 [123 Cal.Rptr.3d 557]; *O'Grady v. Superior Court*

(2006) 139 Cal.App.4th 1423, 1439 [44 Cal.Rptr.3d 72].) Appeal from a final judgment is not an adequate remedy when a court orders production of privileged materials because, once the privileged materials have been disclosed, the harm has occurred and cannot be undone. (*Union Bank of California v. Superior Court* (2005) 130 Cal.App.4th 378, 388 [29 Cal.Rptr.3d 894]; *Raytheon Co. v. Superior Court* (1989) 208 Cal.App.3d 683, 686 [256 Cal.Rptr. 425].)

Review by extraordinary writ is warranted here because the respondent court's order denying the motions to quash will result in the production of privileged materials and "threaten[s] the confidential relationship between [B of A] and its attorney." (*Costco, supra,* 47 Cal.4th at p. 741.) In addition, PCB did not deny the allegations of irreparable injury and inadequate remedy in B of A and Fidelity's writ petition.

### DISPOSITION AND ORDER

The petition for writ of mandate or prohibition is granted. Let a writ of mandate issue directing the respondent court to vacate its order denying the motions by B of A to quash or modify the subpoenas duces tecum and to issue a new order granting the motions with respect to the documents identified on the privilege log appearing at pages 294 through 329 of volume II of the exhibits submitted with the writ petition. This court's order staying the proceedings in the respondent court is vacated. B of A and Fidelity shall recover costs incurred in this proceeding.

Bedsworth, Acting P. J., and Aronson, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied April 10, 2013, S208865. Chin, J., did not participate therein.