Filed 7/28/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| MARK RYCZ,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN FRANCISCO COUNTY,<br><br>        Respondent;<br><br>JOSEFINA MCGARRY et al.,<br><br>        Real Parties in Interest. | A163741<br><br>(San Francisco County Super. Ct. No. CGC-20-584408) |

Stella Grace Yeh (Yeh) attended the University of San Diego. Following a party where Yeh became highly intoxicated, a friend summoned an Uber to take Yeh back to her dorm at the University. That ride was terminated before completion, and the Uber driver, one of the codefendants, Louvensky Geffrard, exited the Interstate 5 freeway at Gilman Drive and allegedly ordered Yeh out of the car. Subsequently, Yeh initiated a second ride request from Uber, and petitioner Mark Rycz (Petitioner) arrived. Yeh did not enter that car and instead left the area. Half an hour later, an eyewitness observed Yeh walk onto the freeway, where she was struck by two different cars. Petitioner alleges Yeh was several miles away from where Petitioner saw her when she was killed. Each aspect of this tragic event occurred in San Diego County.

1

Petitioner is one of several codefendants in a civil action seeking damages for Yeh's death, pending in respondent Superior Court of San Francisco County (Superior Court). The real parties in interest are the plaintiffs. The Superior Court denied Petitioner's motion for change of venue to San Diego County under section 397, subdivision (c) of the Code of Civil Procedure, based on the convenience of witnesses and the interests of justice.[1] Petitioner seeks a writ of mandate directing the Superior Court to set aside denial of the motion and to grant the motion. (§ 400.) Among other things, we conclude the Superior Court erred (1) in reasoning the location of the witnesses was unimportant because they could appear remotely under section 367.75, enacted in response to the COVID-19 pandemic, and (2) in finding Petitioner failed to show venue in San Diego would be more convenient for most witnesses and promote the interests of justice. We grant writ relief to require the Superior Court to grant Petitioner's motion.

BACKGROUND

The Underlying Lawsuit

According to the underlying Third Amended Complaint (Complaint),[2] on May 12, 2018 around 1:30 a.m., Yeh was struck and killed by two vehicles on Interstate 805 southbound in San Diego County. Yeh, a 19-year-old student at the University of San Diego (USD), was highly intoxicated and walking on the freeway.

Plaintiffs and real parties in interest (Plaintiffs) are Josefina McGarry, Yeh's mother, in her individual capacity; Josefina McGarry in her capacity as

---

[1] All undesignated statutory references are to the Code of Civil Procedure.

[2] Unless otherwise indicated, the description of the underlying incident is based on the allegations in the Complaint.

2

a successor in interest to Yeh; and McKenna McGarry Limentani, Yeh's sister, in her capacity as a successor in interest to Yeh. In April 2021, Plaintiffs filed the Complaint against Uber Technologies, Inc. (Uber);[3] Geffrard, an Uber driver; and Petitioner, also an Uber driver.

The Complaint alleges that, prior to Yeh's death, she and some friends attended a party, where Yeh became highly intoxicated; they then proceeded to a fast-food establishment. At 12:49 a.m. on May 12, 2018, one of Yeh's friends requested a ride home for Yeh through the Uber app on Yeh's phone. Defendant Geffrard arrived and picked up Yeh to take her to a dorm at USD. Geffrard traveled north on the Interstate 5 freeway. Yeh was seated in the front passenger seat, and she "forcefully vomited all over the dashboard and interior front windshield" of the car. At around 12:55 a.m., Geffrard allegedly exited the interstate at Gilman Drive, ordered Yeh out of his car, and terminated the ride. He left Yeh in that area, which the Complaint describes as "empty," devoid of "businesses or homes," and "lack[ing] sufficient lighting for pedestrian use." Geffrard did not call 9-1-1 or otherwise ensure Yeh's safety despite his knowledge of her condition.

According to the police report, Geffrard told the police that Yeh canceled the ride after she vomited. Geffrard said he offered to take her back to the pickup location where her friends were, but Yeh declined and asked to be dropped off.

Subsequently, Yeh initiated a second ride request, and Petitioner arrived in the area. Petitioner allegedly did not identify himself as an Uber

---

[3] Real Parties also named as defendants Rasier LLC and Rasier-CA LLC. The Complaint alleges the former is a wholly owned subsidiary of Uber and the parent company of the latter. In this decision, Uber is used to refer to all three companies.

3

driver and Yeh fled onto a freeway off-ramp instead of getting into his car. Petitioner, who allegedly could tell Yeh was highly intoxicated, left the area at 1:03 a.m. and did not contact 9-1-1 for assistance.

According to the police report, Petitioner told the police he had difficulty finding Yeh and, when he located her, he called out that he was her Uber ride but she appeared frightened and did not respond. He saw her cross a freeway off-ramp and disappear into some bushes on the side of the freeway. He assumed she was an intoxicated college student taking a shortcut to a nearby college campus.

Petitioner alleges Yeh was roughly four or five miles away from where Petitioner saw her when she was killed half an hour later. According to the police report, it is unknown how Yeh "traversed the distance between Gillman Drive at I-5 and I-805 at SR-52." An eyewitness told the police he saw Yeh walk onto the freeway and get hit by one car and then another car.

A toxicology report stated Yeh's blood-alcohol level was 0.21 percent.

The Complaint alleges a common carrier negligence claim against Uber and Geffrard; a negligence claim against Geffrard and Petitioner; a negligent hiring, training, and supervision claim against Uber; negligent and intentional misrepresentation claims against Uber relating to assertions about rider safety; a "Bane Act"[4] claim against Uber and Geffrard; a survivorship claim; a wrongful death claim; a wrongful business practices

---

[4] " 'The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law.' " (*Shoyoye v. Cty. of Los Angeles* (2012) 203 Cal.App.4th 947, 955–956.) It was enacted to address hate crimes but is not limited in its application to such conduct. (*Id.* at p. 956.)

4

claim against Uber; and a declaratory relief claim. The negligence cause of action alleges that the location where Geffrard and Petitioner left Yeh was "inherently dangerous" and that Petitioner witnessed her walk on the freeway off-ramp and should have recognized the risk of harm.

In August 2021, Petitioner filed a cross-complaint against Vasthi Curcio, Richard Middleton Rail III, Alison Marie Campos, and Roe defendants, for implied indemnity, contribution, and apportionment.[5] Curcio and Rail allegedly drove the cars that struck Yeh. Campos and unknown Roe defendants allegedly furnished Yeh, a minor, with alcohol and marijuana prior to her death. The cross-complaint also named an unknown Roe defendant who "transported [Yeh] from Gilman Drive and the I-5 in San Diego County by vehicle to the I-805 Southbound, just south of State Route (SR-52)."

Also in August 2021, Petitioner filed an answer to the Complaint. His affirmative defenses include, among others, the comparative fault of Yeh; the comparative fault of third parties, including those named in the cross-complaint; and that there were intervening and/or superseding causes of Yeh's death.

The Motion to Change Venue

On August 16, 2021, Petitioner moved to change venue to San Diego Superior Court for the convenience of witnesses and to promote the ends of justice (§ 397, subd. (c)). Codefendants Geffrard and Uber joined Petitioner's motion.

Petitioner pointed out that the location of Yeh's death is 494 miles from the courthouse in San Francisco and that the only connection between the

_____

[5] The cross-complaint also named Chun Yeh, allegedly "the natural father and heir and successor-in-interest of [Yeh]," as a nominal defendant.

5

case and San Francisco County is that the Uber corporate headquarters is located in San Francisco.  Petitioner argued the case should be transferred to San Diego, "which is where the incident occurred, where the two alleged dangerous conditions are located, and where the vast majority of the relevant and third-party witnesses are based.  Doing so will ensure that the countless non-party lay and government witnesses will not be burdened by having to attend a trial hundreds of miles from their homes and places of employment."

Petitioner's argument continued: "the vast majority of the relevant third-party witnesses — police officers, fire department personnel, AMR personnel, toxicologists, coroners, etc. — are from the County of San Diego. . . .  [T]he events and circumstances leading to [Yeh's] death [were] investigated by the California Highway Patrol in San Diego, the automobile accident causing her death occurred on a freeway in the County of San Diego, and [Yeh's] body was handled by government personnel in the County of San Diego following her death.  [Citation.]  Police officers from the County of San Diego also met with relevant percipient witnesses who lived [in] and were from the County of San Diego in order to investigate the cause of [Yeh's] death, and [Yeh's] belongings were also taken and tested by the local police and a local lab in the County of San Diego."

Petitioner's motion was supported by a declaration from his counsel.  The declaration listed 27 "potential government or third-party healthcare provider witnesses" with work addresses in San Diego.  The declaration also included brief descriptions of the expected subjects of their testimony.  The declaration did not set forth the expected testimony itself, but an extensive police report detailing the investigation was attached.  An investigation report from the San Diego Medical Examiner was also attached to the declaration.

6

Petitioner's counsel's declaration also listed nine "non-party witnesses who are believed to have relevant percipient witness knowledge of the incident or the events leading up to the incident," with brief descriptions of the expected subjects of their testimony. The police report attached to the declaration set forth the accounts they provided the police. The declaration listed San Diego County addresses for six of those witnesses, while counsel averred he "believed" the remaining three lived in Indiana, New Mexico, and the San Francisco Bay Area. Finally, the declaration listed four "non-party damages witnesses" identified by Plaintiffs and "believed to be based out of North Carolina."

The averments of Petitioner's counsel regarding the residences and workplaces of the various witnesses were supported by information in the police report attached to counsel's declaration. The averments were also supported by plaintiff Josefina McGarry's verified amended responses to Petitioner's form interrogatories, attached to Petitioner's counsel's declaration and a declaration submitted in support of Geffrard's reply in support of the motion.

Plaintiffs opposed Petitioner's motion. Among other things, Plaintiffs argued that Petitioner could not rely on the police report as evidence of the locations of the witnesses, that Plaintiffs intended to call Bay Area Uber employees as witnesses, and that any witnesses not located in the Bay Area could testify at trial remotely.[6]

Petitioner, Uber, and Geffrard filed replies in support of the venue transfer motion and the Superior Court heard argument. On October 1,

---

[6] Plaintiffs also argued Uber wanted to change venue because a prior ruling on a demurrer in the case raised the possibility Uber could be found to be a "common carrier." Plaintiffs' speculation regarding Uber's motivation for joining Petitioner's motion is irrelevant to our analysis.

7

2021, the Superior Court issued a written order denying the motion. The Superior Court reasoned as follows: "Defense counsel's declaration merely indicates where third-party witnesses reported residing three years ago. Moreover, [Petitioner's] motion ignores the sea change in litigation over the past 18 months. Many depositions and much trial testimony are now given via audio/video platforms such as Zoom. This is certainly what San Francisco jurors expect. Thus, it matters little, if at all, where a witness resides at the time of trial as travel is unnecessary." The Superior Court's order also dismissed the possibility of jurors visiting the San Diego locations involved in the case, reasoning, "given modern video technology, such visits are rare. Moreover, the at-issue events occurred in the 1 a.m. time frame, so a jury visit at that time would be required to try to replicate conditions. Such a visit would be even more unlikely."

Petitioner timely filed a petition for writ of mandate challenging the Superior Court's ruling, and, after obtaining briefing from the parties, we issued an order to show cause. (§ 400; see *Crestwood Behavioral Health, Inc. v. Superior Court* (2021) 60 Cal.App.5th 1069, 1074 [granting writ review of venue ruling where petition presents an "issue of first impression that might otherwise evade review"].) Plaintiffs filed a return,[7] Petitioner filed a reply to the return, and this court heard oral argument.

---

[7] Petitioner points out that Plaintiffs filed an unverified return brief rather than a demurrer or verified answer. (See Cal. Rules of Court, Rule 8.487(b)(1); *Bank of Am., N.A. v. Superior Ct.* (2013) 212 Cal.App.4th 1076, 1084–1085.) Because we grant Petitioner the relief he seeks, we need not address the consequences of Plaintiffs' failure to file a "true return." (*Bank of Am.*, at p. 1084.)

DISCUSSION

I.    *Legal Background*

Under section 392 et seq., a plaintiff may file an action or proceeding in various locations, depending on the classification of the action and the classification of the parties.  Where there are multiple parties and causes of action, venue may be proper in more than one county.  Under section 397, subdivision (a), "[w]hen the court designated in the complaint is not the proper court," the court may, upon motion, "change the place of trial."  (See also Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2003) ¶ 3:550, p. 3-130 (Weil & Brown).)  Alternately, under section 397, subdivision (c), the court has discretion to transfer the case to another county "[w]hen the convenience of witnesses and the ends of justice would be promoted by the change," even if the complaint was filed in a "proper" county.  (See also Weil & Brown, at ¶ 3:553, p. 3-130.1.)  It is this second type of motion that is at issue in the present case.

A moving party under section 397, subdivision (c) must demonstrate the transfer will promote both the convenience of witnesses and the ends of justice.  (*Peiser v. Mettler* (1958) 50 Cal.2d 594, 607 (*Peiser*); *Wirta v. Vergona* (1957) 155 Cal.App.2d 29, 32.)  Generally, the "convenience of the parties is not to be considered upon a motion for a change of venue."  (*Peiser*, at p. 612.)  "Before the convenience of witnesses may be considered as a ground for an order granting a change of venue it must be shown that their proposed testimony is admissible, relevant and material to some issue in the case as shown by the record before the court."  (*Id.* at p. 607.)  The declaration or declarations supporting the motion should[8] "set forth the names of the

_____

[8] The Supreme Court's *Peiser* decision used the word "must," although the cases from which the court derived the list actually used the word

9

witnesses, the nature of the testimony expected from each, and the reasons why the attendance of each would be inconvenient." (*Ibid.*)  The purpose is "so that the court may, from the issues, judge of the materiality of their testimony and afford opposing counsel an opportunity to stipulate to the testimony proposed." (*Juneau v. Juneau, supra*, 45 Cal.App.2d at p. 17.)  "The convenience of witnesses whose testimony will be merely cumulative is entitled to little consideration." (*Corfee v. S. California Edison Co.* (1962) 202 Cal.App. 2d 473, 477 (*Corfee*).)  The court should also consider reasonable inferences that may be drawn from the information in the supporting materials.  (*Richfield Hotel Mgmt., Inc. v. Superior Ct.* (1994) 22 Cal.App.4th 222, 227 (*Richfield*); *J. C. Millett Co. v. Latchford-Marble Glass Co.* (1959) 167 Cal.App.2d 218, 227 (*J.C. Millett*); *Harden v. Skinner & Hammond* (1955) 130 Cal.App.2d 750, 755.)

"Convenience of witnesses is shown by the fact that the residence of all the witnesses is in the county to which the transfer of the cause is requested. [Citation.]  A conclusion that the ends of justice are promoted can be drawn from the fact that by moving the trial closer to the residence of the witnesses, delay and expense in court proceedings are avoided and savings in the witnesses' time and expenses are effected." (*Pearson v. Superior Ct., City & Cty. of San Francisco* (1962) 199 Cal.App.2d 69, 77 (*Pearson*); accord, *Richfield, supra*, 22 Cal.App.4th at p. 227.)  "A motion for a change of the place of trial on the ground that the convenience of witnesses and the ends of

"should." (*Juneau v. Juneau* (1941) 45 Cal.App.2d 14, 17; *San Jose Hosp. v. Etherton* (1927) 84 Cal.App. 516, 518.)  The use of the word "must" was dicta, because the basis for the court's reversal of the grant of change of venue was that the witness testimony at issue was not material.  (*Peiser, supra*, 50 Cal.2d at p. 612.)  Given the broad language of section 397, subdivision (c), and the lack of any express statutory directives, we believe "should" is the more appropriate word.

justice would be promoted by the change is committed to the sound discretion of the trial court and its determination will not be disturbed on appeal unless it clearly appears, as a matter of law, that there has been an abuse of such discretion." (*Rios v. Lacey Trucking Co.* (1954) 123 Cal.App.2d 865, 868; see also *Thompson v. Superior Ct.* (1972) 26 Cal.App.3d 300, 305 (*Thompson*); *Pearson*, at p. 77.) "Where there is a showing that the convenience of witnesses and the ends of justice will be promoted by the change and there is absolutely no showing whatever to the contrary, a denial of the motion to change venue is an abuse of discretion, there being no conflict of evidence to sustain the decision of the trial court." (*Pearson*, at p. 78; accord *Richfield*, at p. 227; see also *Garrett v. Superior Ct. of Kings Cty.* (1967) 248 Cal.App.2d 263, 268.)

"[T]he code imposes no express time limit within which [a section 397 motion to change venue] must be made. However, it has been stated that such motion must be made within a reasonable time after the answer is filed." (*Thompson*, *supra*, 26 Cal.App.3d at p. 306.)

II.  *Petitioner Demonstrated Venue in San Diego Would Be More Convenient to Most Witnesses*

Petitioner argues, "Plaintiffs' pleadings, extensive police investigative reports, GPS tracking reports, and autopsy reports establish that everything about this case occurred in San Diego and was witnessed and investigated by San Diegans." He continues, "There were numerous witnesses to these events, including Ms. Yeh's school-mates and first responders, almost all of whom still reside in the San Diego area. A few other witnesses reside in other parts of California or out of state. Only one may reside in the San Francisco Bay area. Dozens of San Diego police officers investigated her death and the actions of the two Uber drivers leading up to and after their

11

contacts with Ms. Yeh. Several forensic pathologists were involved in her autopsy." Plaintiffs do not dispute the centrality of San Diego to the underlying events, but they argue Petitioner failed to carry his burden in several respects. Plaintiffs' contentions are without merit.

A. *The Availability of Remote Testimony Did Not Justify Denial of the Motion to Transfer Venue*

At the outset, we address Plaintiffs' contention that the Superior Court appropriately based its denial of the motion to change venue in part on the proposition that "any witnesses inconvenienced by the location of the trial in this matter would be permitted to testify remotely via audio/video platforms such as Zoom." Because none of the pandemic-related statutory or rule changes reflect an intent to supersede section 397, subdivision (c), the Superior Court erred.

1. *Legal Background*

In 2021, while the COVID-19 pandemic continued to rage, the Legislature enacted section 367.75, which, subject to limitations, authorizes parties to appear remotely "in civil cases" and provides that courts "may conduct conferences, hearings, and proceedings, in whole or in part, through the use of remote technology." (§ 367.75, subd. (a); Stats. 2021, ch. 214

12

(S.B. 241), § 5, eff. Jan. 1, 2022.)[9]  In particular, subsection (d)(1) provides, "Except as otherwise provided by law and subject to the limitations of subdivision (b), upon its own motion or the motion of any party, the court may conduct a trial or evidentiary hearing, in whole or in part, through the use of remote technology, absent a showing by the opposing party as to why a remote appearance or testimony should not be allowed."  (§ 367.75, subd. (d)(1).)  In addition to various other restrictions, such as those relating to the access to and adequacy of technology for conducting remote proceedings, subsection (b) provides that a "court may require a party or witness to appear in person at a conference, hearing, or proceeding" if "(3) The court determines on a hearing-by-hearing basis that an in-person appearance would materially assist in the determination of the conference, hearing, or proceeding or in the effective management or resolution of the particular case."  (§ 367.75, subd. (b).)  Importantly, the legislation is temporary: subsection (l) states, "This section shall remain in effect only until July 1, 2023, and as of that date is repealed."  (§ 367.75, subd. (l).)

---

[9] Previously, in April 2020, the Judicial Council adopted an emergency rule of court authorizing remote proceedings "to protect the health and safety of the public."  (Cal. Rules of Court, Appendix I, Emergency Rule 3(a)(1).)  The rule sunsetted on June 30, 2022.  (Cal. Rules of Court, Appendix I, Emergency Rule 3(b).)  While section 367.75 authorizes remote proceedings in civil cases, the Legislature recently authorized criminal remote proceedings in Assembly Bill No. 199 (Reg. Sess. 2021-2022), approved by the Governor on June 30 and effective immediately.  (Stats. 2022, ch. 57 (A.B.199), § 25, eff. June 30, 2022.)  Among other things, the bill added Penal Code section 977.3, which in subdivision (a) authorizes a witness to "testify in any misdemeanor or felony criminal proceeding, except for felony trials, through the use of remote technology with the written or oral consent of the parties on the record and with the consent of the court."  The section is in effect until January 1, 2024.  (Pen. Code, § 977.3, subd. (e).)

In section 367.75, subdivision (k), the Legislature directed the Judicial Council to adopt implementing rules, and the Judicial Council adopted, for civil cases, rule 3.672 of the California Rules of Court[10] ("Remote proceedings"), effective January 1, 2022.[11]  Rule 3.672(a) states, "The intent of this rule is to promote greater consistency in the practices and procedures relating to remote appearances and proceedings in civil cases.  To improve access to the courts and reduce litigation costs, to the extent feasible courts should permit parties to appear remotely at conferences, hearings, and proceedings in civil cases consistent with [] section 367.75."  A "proceeding" includes a trial.  (Rule 3.672(c)(5).)  Rule 3.672(d) affirms a court's "discretion to require in-person appearance" on grounds of access or adequacy of the technology or "if the court determines on a hearing-by-hearing basis that an in-person appearance would materially assist in the determination of the proceeding or in the effective management or resolution of the case."  It also authorizes a court to order a continuance "[i]f, any time during a remote proceeding, the court determines that an in-person appearance is necessary."  Rule 3.672(e)(1) authorizes courts to "by local rule prescribe procedures for remote proceedings, so long as the procedures are consistent with the

_____

[10] All undesignated rules references are to the California Rules of Court.

[11] Section 367.75, subdivision (k) states, "Consistent with its constitutional rulemaking authority, the Judicial Council shall adopt rules to implement the policies and provisions in this section to promote statewide consistency, including, but not limited to, the following procedures: [¶] (1) A deadline by which a party must notify the court and the other parties of their request to appear remotely. [¶] (2) Procedures and standards for a judicial officer to determine when a conference, hearing, or proceeding may be conducted through the use of remote technology.  The procedures and standards shall require that a judicial officer give consideration to the limited access to technology or transportation that a party or witness might have."

requirements of [] section 367.75." Such local rules must provide notice and, "[f]or evidentiary hearing and trials, an opportunity for parties to oppose the remote proceedings." (Rule 3.672(e)(1).)

Rule 3.672(h) pertains to the procedures for a court to provide notice of its intent to conduct a remote evidentiary hearing or trial and for a party to provide notice of its intent to appear remotely at an evidentiary hearing or trial.[12] Although rule 3.672(h)(1) refers to notice of intent to conduct "an evidentiary hearing or trial remotely," we presume the same notice requirements would apply where a court's intent is to conduct a trial remotely *in part* by allowing *some* witnesses to appear remotely. Rule 3.672(h)(3)(A) provides that "a party may make a showing to the court as to why a remote appearance or remote testimony should not be allowed, by serving and filing an Opposition to Remote Proceedings at Evidentiary Hearing or Trial (form RA-015)," either 5 court days before the proceeding or at least noon before the day of the proceeding if the party received less than 15 court days' notice. Finally, rule 3.672(h)(3)(B) provides that, "In determining whether to conduct an evidentiary hearing or trial in whole or in part through the use of remote technology over opposition, the court must consider the factors in section 367.75(b) and (f), and any limited access to

---

[12] Rule 3.672(h)(1)(B) also authorizes local rules "providing that certain evidentiary hearings or trials are to be held remotely, so long as the court procedure includes a process for self-represented parties to agree to their remote appearance and for parties to show why remote appearances or testimony should not be allowed." Plaintiffs do not argue there are any such relevant local rules. In any event, Petitioner would still need to be accorded an opportunity to oppose remote testimony pursuant to any such rule.

technology or transportation asserted by a party. The court may not require a party to appear through remote technology."[13]

### 2. *Analysis*

Section 367.75, implemented by rule 3.672, effectively establishes a presumption in favor of remote proceedings, including remote trial testimony, until July 2023. But Plaintiffs point to nothing in the record suggesting the underlying case will go to trial before then, and it is speculative what statute and rule will govern remote trials after that date.

More fundamentally, there is no basis to conclude the enactment of section 367.75 reflects a legislative direction that courts should assume all testimony will be taken remotely when adjudicating motions to transfer under section 397, subdivision (c). Yet the Superior Court relied on precisely that assumption when it asserted that, due to "the sea change in litigation over the past 18 months" involving remote testimony, "it matters little, if at all, where a witness resides at the time of trial as travel is unnecessary."[14] And, as Petitioner argues, the court's reasoning would effectively render section 397, subdivision (c) meaningless, "since the same reasoning would permit courts to deny a venue change in almost any case no matter how many witnesses would be inconvenienced."

In enacting section 367.75, the Legislature *could have* revised or repealed section 397, subdivision (c) if it intended courts to assume remote testimony will be utilized at trial, at least during the duration of the pandemic. But the Legislature left section 397, subdivision (c) undisturbed,

---

[13] Section 367.75, subdivision (f), prohibits a court from requiring a party to appear remotely.

[14] The Superior Court did not refer to section 367.75 and rule 3.672, but those, in addition to emergency rule 3(a)(1) (see footnote 9, *ante*), authorized the "sea change" the Superior Court observed.

16

and the scheme enacted by the Legislature and Judicial Council contemplates that the appropriateness of remote testimony will be determined only after notice and an opportunity for a party to argue for the necessity of in-person testimony.  In particular, rule 3.672 provides for parties to receive notice of intended remote proceedings and permits a party to object, up to the day before trial if the party receives limited notice.  Both section 367.75 and rule 3.672 contemplate that a court will exercise its discretion to determine whether an "in-person appearance would materially assist in the … effective management or resolution of the" case.  (§ 367.75, subd. (b); rule 3.672(d)(1).)  Further, rule 3.672(d)(3) authorizes a court to continue a trial and require an in-person appearance if it determines such an appearance is necessary "at any time during a remote proceeding."  Plaintiffs do not suggest that the Superior Court's blanket determination that in-person testimony is unnecessary—in resolving Petitioner's venue motion filed immediately after Petitioner's answer—constituted the individualized, informed inquiry contemplated by section 367.75 and rule 3.672.

Further, there is no basis to conclude the adoption of section 367.75 and rule 3.672(d)(3) reflects a legislative determination that remote testimony is always an adequate substitute for in-person testimony at trial.  There have been many benefits from remote proceedings,[15] and section 367.75 reflects a

_____

[15] On August 16, 2021, Chief Justice Cantil-Sakauye's Ad Hoc Workgroup on Post-Pandemic Initiatives published a report entitled, "Interim Report: Remote Access to Courts" (Interim Report). <https://www.courts.ca.gov/documents/P3-Workgroup-Remote-Access-Interim-Report-8162021.pdf>.  There is no final report on the court website.  The Interim Report's "Executive Summary" states, "The majority of judicial branch users and stakeholders who presented to the Ad Hoc Workgroup on Pandemic Initiatives expressed strong support for the expansion of remote access to court proceedings during the pandemic, and for maintaining extensive remote access going forward.  This input confirmed that remote

conclusion that remote testimony *can* be adequate. Nevertheless, one operating assumption of our system of justice has long been that the opportunity to observe witnesses "upon the stand and the manner in which they gave their testimony . . . in no small degree aid[s] in the determination of the truth and correctness of testimony." (*Pac. Coast Title Ins. Co. v. Land Title Ins. Co.* (1950) 97 Cal.App.2d 829, 834; see also Interim Report, *supra*, at p. 6 (see fn. 15, *ante*) ["Although support is strong for the use of remote technology, there is agreement that it can be beneficial and efficient to conduct more substantive parts of both criminal and civil cases in person."].)[16] Of course, modern technology enables the judge and jurors to

proceedings allow individuals who face barriers in accessing the courts (such as having to travel long distances to court or take time off work) to efficiently resolve their court matters, and that providing access to the courts through the use of remote technology is an access to justice issue." (*Id.* at p. 1.) The Interim Report's two "interim recommendations" are that (1) "California courts should expand and maximize remote access on a permanent basis for most proceedings and should not default to pre-pandemic levels of in-person operations;" and (2) "[t]he Judicial Council should encourage and support courts to substantially expand remote access through all available technology and should work to promote consistency in remote access throughout the state to ensure that Californians have equal access to the courts while providing flexibility to meet local needs." (*Id.* at p. 10.) Neither of those recommendations, nor any other assertion or conclusion in the Interim Report, reflects a finding that remote trial testimony is always adequate.

[16] Though conclusions regarding the net benefits of remote trial testimony are beyond the scope of this decision, we note that, since the pandemic's beginning, academics and policy institutes have discussed the advantages and possible pitfalls of such testimony. (See, e.g., Turner*, Remote Criminal Justice* (2021) 53 Tex. Tech L. Rev. 197; Bannon & Keith, *Remote Court: Principles for Virtual Proceedings During the COVID-19 Pandemic and Beyond* (2021) 115 Nw. U. L. Rev. 1875; Jones, et al., *Does Convenience Come with a Price? The Impact of Remote Testimony on Perceptions of Expert Credibility* (2022) Crim. Justice Behav.; Bannon & Adelstein, *The Impact of Video Proceedings on Fairness and Access to Justice in Court,* Brennan

18

observe the face and tone of voice of a witness appearing remotely by video, which may be sufficient for the factfinder to make the necessary credibility determinations.  However, nothing in the language or legislative history of section 367.75 reflects a determination that the opportunity to observe a witness' overall body language and demeanor is without value.  In fact, the clear language of the statute establishes the exact opposite.

The clarity of the statutory language eliminates any need to analyze the legislative history.  (*Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 519.)  But that history confirms section 367.75 was enacted *only* to ensure that, post-pandemic, courts could continue to conduct remote proceedings when appropriate.[17]  Thus, the final Senate Analysis of SB 241 explained, "As we continue to face a pandemic and an unprecedented backlog, remote hearings and trials are essential to allow the wheels of justice to continue to turn.  Without a statute in place, when the State of Emergency is lifted the emergency rules will also expire, bringing us back to March of 2020, before the courts were able to pivot to remote hearings and hybrid trials." (Sen. Rules Comm., Off. of Sen. Floor Analysis of Sen. Bill 241 (2021-2022 Reg. Sess.) Sep. 9, 2021.)  The bill analysis emphasized that "SB 241 only provides temporary authorization, thereby ensuring that California can continue to benefit from the use of technology while also promoting … additional consideration of future improvements to the statute to allow remote proceedings to be conducted in the most effective and efficient way possible." (*Ibid.*)

---

Center for Justice (2020) <https://www.brennancenter.org/media/6631/download>.)

[17] The legislative history to Senate Bill 241 (SB 241), the bill enacting section 367.75, does not reflect that the Legislature considered any studies or any factfinding regarding the efficacy of remote testimony.

Section 367.75 reflects no final, considered judgment regarding remote testimony, and a trial court could, fully consistent with the statutory scheme, decide in a particular case that having some or most witnesses testify in person will enhance the court's or jury's role as fact-finder. Moreover, other considerations beyond credibility determinations could enter into a trial court's decision whether to require in-person testimony. For example, in-person testimony allows witnesses to more easily see physical evidence and engage with demonstrative exhibits. Or a trial court reasonably could be concerned about maintaining the attention and engagement of jurors should an extended trial become a long line of shifting witness faces on a screen. Additionally, locating a trial in a venue convenient to most witnesses maintains flexibility. For example, it allows the trial court to make the determination whether to allow remote testimony on a case-by-case basis, based on the perceived importance or sensitivity of the testimony informed by the actual circumstances of trial. It would also allow a trial to proceed without delay if access to technology or technical difficulties temporarily rendered remote testimony infeasible. Section 367.75 allows courts to take advantage of the benefits of remote testimony while preserving the flexibility to require in-person testimony, as appropriate. The Superior Court's reasoning in the present case—a blanket determination at an early stage in the case that all trial testimony will be done remotely—entirely undermines the discretion and flexibility built into the statutory scheme.

The Superior Court erred in finding that the availability of remote testimony made it unimportant whether most witnesses were located in San Diego. Remote trial testimony may well be routine, even after the pandemic recedes. Attorneys and the courts may become so effective at presenting remote testimony that a consensus forms that remote testimony is adequate

20

in civil cases for all but the most critical witnesses.  However, even putting aside the temporary nature of the scheme, section 367.75 and rule 3.672 do not reflect any such judgment—instead, the scheme leaves the determination to a court's informed, individualized exercise of discretion.  Moreover, even if a consensus were to emerge in favor of remote testimony, that would not mean the locations of witnesses is irrelevant, given the discretion afforded the trial judge to require in-person testimony.  In sum, construing section 367.75, rule 3.672, and section 397, subdivision (c) in harmony (*State Dep't of Pub. Health v. Superior Ct.* (2015) 60 Cal.4th 940, 955), the availability of remote testimony is a circumstance that may ease the inconvenience for any witnesses that live in a location distant from the site of trial, but it is not a proper basis for denying a motion to transfer a case to the county where most witnesses are located.

B.     *Petitioner Demonstrated Most Potential Witnesses Are in San Diego*

Plaintiffs argue the evidence presented in support of the motion to change venue failed to meet Petitioner's burden because the addresses of the non-party witnesses were taken from the police report.  They argue the addresses therein were inadmissible hearsay.

Petitioner argues the police report was admissible under the official records exception to the hearsay rule.  (Evid. Code, § 1280.)  That exception provides that "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered … to prove the act, condition, or event if" the writing was made "within the scope of duty of a public employee," "at or near the time of the act, condition, or event," and "[t]he sources of information and method and time of preparation were such as to indicate its trustworthiness." (*Ibid.*)  However, Petitioner cites no

21

authority that exception encompasses the admission of witness addresses in a police report as evidence of the residence of those witnesses, or as evidence of the work locations of police and medical personnel. (See *People v. Baeske* (1976) 58 Cal.App.3d 775, 780–781 [" 'a public employee's writing, which is based upon information obtained from persons who are not public employees, is generally excluded because the "sources of information" are not "such as to indicate its trustworthiness" ' "]; accord, *Alvarez v. Jacmar Pac. Pizza Corp.* (2002) 100 Cal.App.4th 1190, 1206.)[18]

In any event, almost the same witness address information was provided by Plaintiffs in their discovery responses. Petitioner's motion listed 40 potential witnesses and their addresses "[b]ased on the police report and the discovery received to date." Twenty-seven of the witnesses were "government or third-party healthcare provider witnesses" with San Diego business addresses. Additionally, there were nine non-party percipient witnesses, including Yeh's friends or acquaintances and witnesses who observed Yeh at the location of her death. Finally, there were four non-party damages witnesses "believed to be based out of North Carolina." Amended responses of plaintiff Josefina McGarry to Petitioner's first set of form interrogatories, dated August 12 and 13, 2021, were submitted in support of Petitioner's motion. The responses listed San Diego work addresses for 26 of the 27 law enforcement or medical witnesses. Of the nine non-party percipient witnesses, Petitioner averred that six resided in San Diego. Plaintiffs' discovery responses listed the same San Diego addresses as Petitioner for two of those six; the responses identified the remaining four by

---

[18] It may be that the assertions about the workplaces of the law enforcement and medical personnel were based on the personal knowledge of the preparer or trustworthy sources of information, but the record does not contain sufficient information to so conclude.

name but did not list any addresses for them.[19]  The discovery responses did not list San Francisco County addresses for any of the witnesses.

Plaintiffs' discovery responses are party admissions.  "Admissions contained in depositions and interrogatories are admissible in evidence to establish any material fact." (*Leasman v. Beech Aircraft Corp.* (1975) 48 Cal.App.3d 376, 380; see also *Aguilar v. Atl. Richfield Co.* (2001) 25 Cal.4th 826, 843 [listing "answers to interrogatories" as a type of "evidence" that may be presented in favor or in opposition to a motion for summary judgment].)  In particular, Plaintiffs' admissions are statements of a party opponent and not subject to exclusion under the hearsay rule.  (Evid. Code, § 1220; see also *People v. Rodriguez* (2014) 58 Cal.4th 587, 637.)

Plaintiffs admit their discovery responses "may be" admissible, but they argue that they were not required to provide the information because it was equally available to the defendants, and that they were not required to make an inquiry of third-party witnesses to obtain the requested addresses. However, Plaintiffs fail to explain why those propositions undermine the admissibility of the responses they elected to provide.  Plaintiffs further assert that their discovery responses lacked evidentiary weight because the addresses were taken from the years-old police report, but the discovery responses do not state the source of the information or suggest the

---

[19] Petitioner listed San Diego addresses found in the police report for those four witnesses.  Because Petitioner showed San Diego was a more convenient venue for the vast majority of witnesses, it is unnecessary to consider whether the police report was admissible and adequate evidence of the residences of those four witnesses.  Petitioner's counsel's declaration averred that he "believed" three of the non-party percipient witnesses lived outside San Diego County, in Indiana, New Mexico, and the San Francisco Bay Area.

information is stale or otherwise unreliable.[20]  If Plaintiffs believed they were not required or able to answer the questions presented to them in discovery, they could and should have indicated so in their responses.  (§ 2030.220, subd. (c) ["If the responding party does not have personal knowledge sufficient to respond fully to an interrogatory, that party shall so state, but shall make a reasonable and good faith effort to obtain the information by inquiry to other natural persons or organizations, except where the information is equally available to the propounding party."].)

Plaintiffs provide no reason why or cite any authority that Petitioner could not rely on Plaintiffs' unequivocal and admissible discovery responses to make a prima facie showing of the location of the witnesses.  Those responses were dated August 2021, which is the same month Petitioner filed the motion to change venue, so the responses were evidence of the current locations of the witnesses.  Although Plaintiffs' responses did not "constitute 'incontrovertible judicial admissions' of a fact that bar[red Plaintiffs] from introducing other evidence that controverts the fact" (*Whitmire v. Ingersoll-Rand Co.* (2010) 184 Cal.App.4th 1078, 1089), Plaintiffs presented no evidence that any of the witnesses lived elsewhere.

The only reasonable inference from the evidence is that trying the case in San Francisco County, roughly 500 miles from the residences and workplaces of most of the third party witnesses, would present a substantial inconvenience to those witnesses without being more convenient to virtually

---

[20] We also observe that Plaintiffs cite to nowhere in the record where there is a sworn averment as to the source of the information in the discovery responses.  It is improper to undermine verified discovery responses by an unverified assertion as to the source of the information in the responses.

24

any witness.[21]  (See *Pearson*, *supra*, 199 Cal.App.2d at p. 78 ["it is a most reasonable and natural inference" that witnesses will be inconvenienced by the need to travel from San Diego to San Francisco for trial]; see also *Richfield*, *supra*, 22 Cal.App.4th at p. 227 [inferring "significant" "lost working time and travel expenses" for witnesses living or working 210 miles from county in which lawsuit was filed]; *J. C. Millett*, *supra*, 167 Cal.App.2d at p. 227 [inferring "it would be inconvenient for [witnesses] to travel over 400 miles from their place of employment and residence to a trial of indefinite duration"].)  We reject the Superior Court's contrary determination.[22]

[21] There is evidence that a single witness lives near San Francisco. Petitioner's counsel's declaration states, "[p]er recent testimony, it is believed that [potential witness Alexandra Cooley] lives in the San Francisco Bay Area."  The parties do not address whether that averment by Petitioner's counsel, unsupported by any evidence, established her residence for the purpose of the motion.  We also observe Plaintiffs argued below (but not on appeal) that they intend to present testimony from Uber witnesses who might work or reside in San Francisco County.  Assuming it would be appropriate to consider the convenience to the employees of a party when called as adverse witnesses (see *J. C. Millett*, *supra*, 167 Cal.App.2d at p. 227), Plaintiffs failed to identify any particular witnesses or their locations, so there were no Uber witnesses for the Superior Court to consider.

[22] Plaintiffs point out that Petitioner failed to submit declarations from the witnesses themselves, as was done in some prior cases, such as *Richfield*, *supra*, 22 Cal.App.4th at page 224.  (See also Weil & Brown, *supra*, at ¶ 3:577, p. 3-169 ["Get declarations from each witness if possible. *Do not rely on declarations by counsel alone*. (Declarations by the moving party's counsel as to where the witnesses reside, and their 'conveniences,' are usually hearsay or conclusions.)"].)  Although that may be advisable where possible, witness declarations are not required by section 397, subdivision (c); counsel declarations have been employed in past published cases (see, e.g., *Pearson*, *supra*, 199 Cal.App.2d at p. 72; *J. C. Millett*, *supra*, 167 Cal.App.2d at pp. 222–223); and the inconvenience to witnesses may be inferred where the witnesses are located far from the trial venue.  In the present case, as explained herein, Plaintiffs' discovery responses are admissible evidence of the locations of most of the witnesses.

25

C.    *Petitioner Demonstrated the Materiality of the Witness Testimony*

Plaintiffs also argue, in effect, that most of the witnesses identified by Petitioner have no material testimony to present. (*Peiser*, *supra*, 50 Cal.2d at p. 607 [proposed testimony must be "admissible, relevant and material to some issue in the case as shown by the record before the court"].) They assert, "there is no dispute as to how Ms. Yeh died. There is no dispute that she was intoxicated when it happened. There is no dispute where she was when she was killed. There is no dispute who was driving the two cars that struck and killed her. There is no dispute as to the injuries she suffered that caused her death. In fact, nothing is in dispute and at issue in this case, from the time she arrived at the 805 freeway to her death. Instead, the only thing at issue here is whether [Geffrard, Petitioner, and Uber] owed Ms. Yeh a duty and whether they breached that duty by leaving her where they did, when they did, in the condition she was in when they left her."

Plaintiffs have an overly narrow view of the case. They are correct the particulars about the condition of Yeh's body and manner of death are not material to the issues in the case. They are also correct that a number of the law enforcement and medical personnel witnesses are likely to have cumulative testimony. However, there are a range of additional factual issues relevant to liability. The non-party witnesses identified by Petitioner include persons who interacted with Yeh before her death (including earlier in the evening and just prior to the collisions), as well as police officers who investigated the scene of Yeh's death and interviewed numerous witnesses. Under the "comparative negligence" or "comparative fault" system, " 'liability for damage will be borne by those whose negligence caused it in direct proportion to their respective fault." (*B.B. v. Cty. of Los Angeles* (2020) 10 Cal.5th 1, 14.) Thus, the circumstances and extent of Yeh's inebriation

are potentially relevant to Petitioner's comparative fault defense, both as it relates to Yeh's responsibility for her death and the responsibility of those who provided her intoxicants. The circumstances of the collisions that resulted in Yeh's death are potentially relevant to Petitioner's comparative fault defense both as it relates to the responsibility of Yeh and of the cross-defendants who were driving the vehicles that hit her. The same circumstances are relevant to Petitioner's defense based on causation principles (see *Cole v. Town of Los Gatos* (2012) 205 Cal.App.4th 749, 770), as well as Petitioner's cross-complaint.[23]

Finally, although Plaintiffs suggest the testimony of various witnesses could be stipulated to, Plaintiffs point to nowhere in the record where they actually offered to stipulate to specific facts. In order to support rejection of a motion to transfer venue, a proposed stipulation " 'must be to the effect that the facts sought to be established by the witnesses will be admitted upon the trial.' " (*Nelson v. Enos* (1941) 47 Cal.App.2d 79, 81; accord, *Thompson*, *supra*, 26 Cal.App.3d at p. 307; see also 3 Witkin, Cal. Procedure (5th ed. 2008) Actions, § 950, pp. 1173–1174.)

Accordingly, Plaintiffs failed to rebut Petitioner's showing regarding the materiality of the testimony of the identified San Diego witnesses.

---

[23] We also note a factual mystery at the center of the case: The question of how Yeh was transported to the location of her death from the location where Geffrard dropped her off and Petitioner interacted with her, which Petitioner alleges (and Plaintiffs do not dispute) was four or five miles away. Although no witness to that event has been identified, it is probable that any witnesses identified will be located in San Diego County.

III. *Transfer to San Diego Promotes the Interests of Justice*

As the court of appeal pointed out in *Pearson*, *supra*, 199 Cal.App.2d 69, where a venue is clearly more convenient to most of the witnesses, that alone supports an inference that moving the trial promotes the interests of justice because "delay and expense in court proceedings are avoided and savings in the witnesses' time and expenses are effected." (*Id.* at p. 77; accord, *Richfield*, *supra*, 22 Cal.App.4th at p. 227; see also *J. C. Millett*, *supra*, 167 Cal.App.2d at p. 228 ["saving in the witnesses' time and expense … promote[s] justice"].)

Additionally, more general interests of justice are promoted by conducting trial in the venue that has the clearly greater connection to the underlying events. Among other things, " '[t]here is a local interest in having localized controversies decided at home' " (*Seybert v. Imperial County* (1956) 139 Cal.App.2d 221, 234 (*Seybert*)); " '[j]ury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation' " (*ibid.*); maintaining the possibility of ordering in-person testimony in jury trials preserves flexibility for trial courts (see *J. C. Millett*, *supra*, 167 Cal.App.2d at p. 228); "the witnesses would be readily accessible for immediate recall if further testimony was desirable, thus preventing needless delays" (*ibid.*); and, given the number of law enforcement and medical personnel named as potential witnesses, it will benefit the public to minimize the amount of time they are required to be away from work. Generally speaking, conducting trials in the venue most connected to the underlying events contributes to a more fair and efficient system of justice.

Finally, the possibility of a site visit supports moving venue to San Diego. As the Superior Court pointed out at the hearing on the motion below, site visits are rare and video usually is an adequate substitute. Nevertheless,

28

the present case is one in which a site visit is at least plausible, given that Plaintiffs' theory of negligence depends on an assessment of the location where Geffrard dropped off Yeh and where Petitioner failed to pick her up. Plaintiffs argue the location was so obviously dangerous that Geffrard and Petitioner should, at the very least, have called 9-1-1. Furthermore, Petitioner told the police he was not concerned about Yeh because he thought she was taking a shortcut through bushes to a nearby college, not walking onto the freeway. Resolution of those issues may well require a nuanced understanding of the location and the possibility a site visit might be appropriate provides additional support for a finding that transfer of the case would promote justice. (See *Seybert, supra*, 139 Cal.App.2d at p. 231.)

Petitioner demonstrated the interests of justice clearly favor venue in San Diego. Plaintiffs point to no circumstances suggesting "that the ends of justice would not be promoted by the change. Therefore, no conflict was presented to the trial court on this issue either." (*Pearson, supra*, 199 Cal.App.2d at p. 79.)

IV. *Conclusion*

Although Plaintiffs vigorously challenge the adequacy of Petitioner's showing regarding the convenience of the witnesses, their arguments fail. And Plaintiffs make virtually no effort to justify San Francisco County as the more convenient and just venue: they cite no evidence of any witness working or residing in San Francisco County and articulate no reason why the interests of justice would be promoted by retaining the case in San Francisco County. The present case is comparable to past cases that have affirmed or mandated transfers where all of the underlying events and virtually all of the witnesses were located in another part of the state. (See *Richfield, supra*, 22 Cal.App.4th at pp. 226–227 [transfer venue to county where witnesses live

29

or work and the relevant events took place]; see also *Garrett v. Superior Ct. of Kings Cty., supra,* 248 Cal.App.2d 263, 268–269; *Henson v. Superior Court for Yuba County* (1963) 218 Cal.App.2d 327, 329–330; *Pearson, supra,* 199 Cal.App.2d at pp. 77–81; *Seybert, supra,* 139 Cal.App.2d at pp. 231–232.) Although section 367.75 appropriately recognizes that remote proceedings have been critical to the administration of justice during the pandemic and likely will have a central place in the state's system of justice going forward, we reject the Superior Court's conclusion that the availability of remote testimony means section 397 motions based on the convenience of witnesses are a relic of the past.

The ultimate "question is whether, upon the showing made by petitioner as to the convenience of these witnesses and the ends of justice, the trial court could reasonably conclude that petitioner had not sustained its burden [citation], and whether such showing was sufficiently contradicted by the record before it to allow the trial court to exercise its discretion." (*Union Tr. Life Ins. Co. v. Superior Ct. for Ventura Cty.* (1968) 259 Cal.App.2d 23, 28.) The Superior Court abused its discretion in denying Petitioner's motion to transfer venue to San Diego County.

DISPOSITION

Let a peremptory writ of mandate issue directing the Superior Court to (1) vacate its October 1, 2021 order denying Petitioner's section 397, subdivision (c) motion to transfer the underlying case from San Francisco County to San Diego County and (2) enter a new order granting the motion. Petitioner shall recover his costs. (Rule 8.493(a).)

30

SIMONS, J.

We concur.

JACKSON, P. J.

WISEMAN, J.[*]

(A163741)

---

[*] Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

## Rycz v. Superior Court (A163741)

Trial Judge:      Hon. Richard B. Ulmer, Jr.

Trial Court:      San Francisco County Superior Court

Attorneys:

      Bremer Whyte Brown & O'Meara LLP, John O'Meara and Casey B. Nathan; Greines, Martin, Stein & Richland LLP, Marc J. Poster for Petitioner.

      de la Peña & Holiday LLP, Gregory R. de la Peña, Thomas J. O'Brien, Kevin N. LaBarbera, and R. Wesley Pratt for Real Parties in Interest.